UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                          )
CHRIS McLAUGHLIN, et al,   )
                          )
        Plaintiffs,        )
                          )      Civil Action
v.                         )      No. 06-11299-GAO
                          )
BOSTON HARBOR CRUISES,     )
et al,                     )
                          )
        Defendants.        )
                          )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**<u>MOTION HEARING</u>**



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, February 11, 2010
3 p.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1   APPEARANCES:

2       SHAPIRO HABER & URMY LLP
        By: Charles E. Tompkins, Esq.
3           Robert E. Ditzion, Esq.
        53 State Street
4       37th Floor
        Boston, Massachusetts  02109
5       On Behalf of the Plaintiffs

6       MASTERMAN CULBERT & TULLY
        By: Mary E. O'Neal, Esq.
7       One Lewis Wharf
        Boston, Massachusetts  02110
8       On Behalf of the Defendants

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              (The Court enters the courtroom at 3:02 p.m.)

4              THE CLERK:  For a motion hearing, the case of

5     McLaughlin versus Boston Harbor Cruises, which is Docket

6     06-11299.

7              Will counsel identify yourselves for the record.

8              MR. TOMPKINS:  Charles Tompkins for the plaintiffs.

9              MR. DITZION:  Robert Ditzion for the plaintiffs.

10             MS. O'NEAL:  Good afternoon, your Honor.  Mary O'Neal

11    for the defendants.

12             THE COURT:  Okay.  Sorry we had to reschedule from

13    yesterday, kind of pointlessly, as it turns out.

14             There are two motions.  One is just scheduling, and

15    we'll come to that in a second.  I wanted to address first the

16    motion to exclude the class members.  I'm not sure I understand

17    what the controversy is.  It's your motion.

18             MS. O'NEAL:  It is my motion, your Honor.  Thank you.

19             Your Honor, notice was provided to the class

20    members -- there were 415 of them -- by first-class mail.

21    Pursuant to an order of this Court whereby the plaintiffs were

22    to file a declaration as to what was the outcome of the notice

23    ordered by the Court, it was determined, actually by the second

24    declaration filed by Mr. Urmy in response to the motion to

25    exclude, that 53 of the notices that were mailed by mail were

1    returned, including four of the opt-in plaintiffs.  As your

2    Honor will recall, first this case proceeded as an opt-in under

3    the FLSA, and about 55 individuals opted in.  So of the 53 that

4    were returned as undeliverable, four of them had been mailed to

5    four opt-in plaintiffs who are represented by plaintiffs'

6    counsel, and three of whom had different addresses than the

7    addresses that were in our records as the last known address.

8    So plaintiffs' counsel did not use addresses that were known to

9    plaintiffs' counsel because they were representing three of

10    these four opt-in individuals and didn't use the current

11    addresses.

12         I think what's important in terms of that particular

13    discrete issue is that when both sides filed with your Honor a

14    version of the notice that we each wanted your Honor to adopt,

15    the letter that was filed on behalf of both counsel had

16    indicated that if the plaintiffs had more recent addresses,

17    e.g., as a result of updated information, or information

18    provided by particular class members as a result of the opt-in

19    process, the plaintiffs would use the better addresses.

20         With respect to three of the class members, they did

21    not.  And with respect to the fourth -- the fourth opt-in --

22    although they used the same address as they had that was

23    indicated on the opt-in consent, it was obviously not a good

24    address because it was returned as undeliverable.  Presumably,

25    plaintiffs' counsel should have the address of a party that

1    they represent.

2          All right.  So we had 52 -- 53, actually, your Honor,

3    notices mailed back to plaintiffs' counsel.  Of the 52,

4    reportedly by Mr. Urmy's declaration, the post office provided

5    better addresses for two of them.  We don't know from the

6    declaration who those two were, and we don't know when, in

7    fact, the notices were remailed to those two

8    post-office-provided addresses.  Of the 52, reportedly by

9    Mr. Urmy as a result of an Internet search, they found

10   addresses for 41 of the individuals and remailed the notices.

11         Here's one of the important issues in terms of the

12   remailed notices:  The Court's order, at least according to the

13   clerk's note of proceedings that took place before your Honor

14   on May 13th, ordered that there was to be a 45-day response

15   period.  And, unfortunately, when 41 of the 52 notices were

16   remailed, they were done on dates such that the least period of

17   time left in the 45 was four days, and the greatest period of

18   time left was 44 days.  So these individuals, assuming they

19   received notices, did not have an opportunity to opt out in a

20   timely way because they weren't provided with the 45-day

21   ordered response period.

22         THE COURT:  Why was there a difference among

23   recipients?

24         MS. O'NEAL:  Because what happened, your Honor, is

25   that they just kept the same date.  So in other words, the

1     first mailing went out timely.  Let's say it was actually 46

2     days prior to the recited July 18, I believe it was, opt-out

3     date.  So when the other notices were mail and remailed.  There

4     was no change.

5              THE COURT:  That date didn't get changed?

6              MS. O'NEAL:  It did not, your Honor.

7              THE COURT:  And so it was the dates of mailing that

8     changed the remaining period?

9              MS. O'NEAL:  Exactly right.  That's exactly right,

10    your Honor.

11             Now, of the 53 whose mailings were returned, I've

12    already addressed 41 of them.  With respect to 11 individuals,

13    reportedly, by Mr. Urmy's declaration, they couldn't find

14    addresses for those 11, even though one of the 11 was an opt-in

15    plaintiff whom they represented.  So no addresses for 11.  So

16    11 didn't get any sort of a remailing at all; addresses off the

17    Internet for 41 of them, the date for response doesn't get

18    changed -- some folks had four days, some folks had 44 days, no

19    one had 45 days -- and of those 41 that were mailed out, eight

20    of them were returned, and there was no further mailing and

21    there was no further opportunity or effort to find better

22    addresses.

23             And with respect to the 11 that they said they

24    couldn't find addresses at all, I mean, Boston Harbor Cruises

25    clearly has dates of birth, Social Security numbers; and,

1   therefore, to the extent that a more-specific search could have

2   been made as to what are the addresses for these folks that

3   have Social Security numbers and dates of birth, there was no

4   inquiry.

5          So what we are left with, your Honor, is a total of 20

6   people who clearly did not receive actual notice.  Twenty

7   individuals never received the mailing.  And we argue nor did

8   they receive any type of constructive notice, because here the

9   only notice was to be effectuated by first class mail.

10         Now, in this circuit, cases that have addressed the

11  issue of when and under what circumstances the return of a

12  mailing of notice of the class doesn't matter have done so,

13  including this Court, where there were alternative methods of

14  notice provided; for example, published notices in 33

15  newspapers of general circulation, published notice in the

16  Boston Globe, published notice in newspapers in every single

17  state in the union.  Plus, the engagement -- in a case that

18  this Court determined, Duhaime v. John Hancock, engaging the

19  services of a professional to attempt to locate the individual,

20  and then a remailing with the information determined by the

21  professional who was hired to relocate the individual.

22         Now, why is this important?  It's important for two

23  reasons, your Honor.  One is that the Rule 23 provides

24  specifically for the best notice that is practicable under the

25  circumstances including individual notice to all members who

1    can be identified through reasonable effort.  So it's including

2    but not limited to.  Here there was an attempt to mail notice

3    to those individuals whom we provided addresses for -- some of

4    which were over five years old, although we provided the

5    addresses that were the best last-known addresses to us -- and

6    no additional efforts to either publish or post or whatever.

7           In addition to the requirements under Rule 23, there

8    are basic due process obligations that in order for this Court

9    to exercise jurisdiction over these absent class members, at a

10   minimum there needs to be an opportunity provided to the absent

11   class member to essentially opt out of the litigation.  And

12   with respect to the 20 individuals here, that did not occur.

13   They did not receive actual notice, nor did they receive

14   constructive notice.

15          Now, plaintiffs' counsel places a fair amount of

16   reliance upon a case.  It's the Peters case.  And it's from the

17   United States Court of Appeals for the District of Columbia.

18   It's a 1992 case.  And I would suggest to the Court that both

19   factually and as a matter of the legal issues before the Court,

20   it is significantly distinguishable.  In the Peters case, the

21   plaintiff was actually a class member who had received notice

22   by mail during the pendency of the action, and then had also

23   received notice of the settlement of the case.  He claimed he

24   didn't get the notice because although the address that was

25   used was correct, they used an incorrect ZIP code and did not

1   include his apartment number.

2        So the court undertook to determine whether the lower

3   court, which had dismissed his case that he filed against the

4   class action defendant, should be upheld.  And the court

5   indicated that its consideration was with respect to two

6   competing legal principles:  One was the principle that the

7   defendant, who was the defendant in the class action, was

8   asserting based on res judicata, and the other competing

9   principle was the plaintiff's assertion that he was essentially

10  denied due process because they didn't get his ZIP code right

11  and they didn't get his apartment right.

12       The court concluded ultimately that, as between the

13  two competing legal interests, res judicata and due process,

14  they were going to essentially go with the res judicata,

15  because the principles of the finality of the settlement were

16  critically important and having in mind that the court noted

17  that it wasn't the class defendant's fault that the address was

18  incorrect because class counsel had actually inserted the

19  incorrect ZIP code.

20       So the court said, as between those competing legal

21  principles, the court was going to determine that the plaintiff

22  was afforded due process, especially where it was not the fault

23  of the defendant that the ZIP code was incorrect, and he had

24  purportedly received notice of the class action itself and

25  notice of the settlement.  And the competing legal principles,

1   res judicata, essentially, was an important one that the court

2   was going to uphold, noting to the plaintiff, though, that if

3   he wanted to file some sort of a negligence action against

4   class counsel, he could do so.

5        Our facts are very different here.  We have 20

6   individuals who have no idea -- because they did not receive

7   actual notice and there was no other form of notice that would

8   provide them constructive notice -- that they had the

9   opportunity to opt out of this class.  So those are the legal

10  arguments, your Honor.  I think it is just inappropriate -- and

11  I would say this one thing -- inappropriate that it is

12  suggested in the opposition that because of the fair number of

13  individuals who actually opted out, that somehow the actions of

14  Boston Harbor Cruises are called into question and perhaps

15  there has been suggestion by Boston Harbor Cruises to its

16  employees that they ought to opt out; in fact, it's even

17  included in Mr. Urmy's declaration that an unidentified

18  individual was told by an unidentified manager that he needed

19  to opt out, and when he didn't, he was terminated.

20       There's no facts to support that very serious

21  assertion, and there's no citation to any record; there are no

22  affidavits.  And it's sort of similar to an assertion that was

23  made in this very case by an opt-in individual, Shaun Nye --

24  and your Honor may -- or probably does not recall his

25  affidavit, that he filed an opposition to Boston Harbor

1    Cruise's motion for summary judgment -- where he essentially

2    said, unidentified individuals, plural, told other unidentified

3    individuals, plural, who told him that they were afraid to opt

4    in -- this is at the FLSA time period -- because they felt that

5    they would be retaliated against.  It's a similar assertion.

6    It doesn't have any basis in fact and it's inappropriate.

7            THE COURT:  So what are you looking for?

8            MS. O'NEAL:  I'm looking for an order that the 20

9    individuals who did not receive either actual or constructive

10   notice of their opportunity to opt out of this litigation be

11   excluded as class members.  Those individuals are identified by

12   name in Mr. Urmy's Exhibits 4 and 5 to his declaration.  And it

13   also includes someone that we didn't know about when we filed

14   our motion in terms of not having received a notice, and his

15   name is Chaz Durham.

16           THE COURT:  He's the opt-in person?

17           MS. O'NEAL:  He's an opt-in.  And there's another

18   opt-in in 19, Abigail Payne.

19           THE COURT:  Okay.  I guess one of the things that

20   puzzled me about this -- I thought that's what you wanted.  But

21   why don't you want them in the class so they'd be bound by the

22   result?

23           MS. O'NEAL:  Because, your Honor, I think that one of

24   the things that Mr. Urmy indicated in his declaration that is

25   accurate is that collectively they represent about $3,000 worth

1    of overtime.  So is it likely that they will bring their own

2    individual action?  And the answer is likely no.

3         THE COURT:  But if they're not available, how are they

4    going to submit a proof of claim, which would inevitably be

5    what would happen?  This is not going to be a pro rata

6    distribution, right, if there's a recovery?

7         MS. O'NEAL:  It shouldn't be pro rata.

8         THE COURT:  It would be on a claim submission basis of

9    some kind.  I worked so many extra hours or whatever.  I was a

10   deckhand deli staff and I worked these hours, or something like

11   that?

12        MS. O'NEAL:  Yes, your Honor.

13        THE COURT:  So it would be individually tailored.  And

14   so for these 20 people, you'd never hear from them.

15        MS. O'NEAL:  Well, your Honor, you could be very

16   right, and it's a consideration that has been given.

17        THE COURT:  Okay.

18        MS. O'NEAL:  Thank you, your Honor.

19        MR. TOMPKINS:  Your Honor, may I respond in the

20   reverse order that Ms. O'Neal addressed things?  First,

21   she's -- with all due respect, she's wrong about what the law

22   requires in terms of notice; and, second, more importantly,

23   even if she were right, the relief that she requests of

24   excluding the class members is exactly wrong, because what

25   should be done, if anything, is to provide more notice.  But as

 1  I will discuss, that's just unnecessary.

 2          What we did, and we did it pursuant to a joint request

 3  of the Court -- I mean, I think it's important we open our

 4  papers by noting that the parties agreed in a joint submission

 5  that the form of notice would be a letter mailed to the last

 6  known address that was supplied by Boston Harbor Cruises.  So

 7  that's what we did.

 8          Once we got back, predictably, some people whose, you

 9  know, last known address wasn't good -- which I don't think is

10  particularly surprising given the fact we have a lot of

11  seasonal employees here and this case has been pending for some

12  time -- we used an Internet service called the Accurint

13  Service.  I'm not that familiar with it, but our paralegals

14  inform me it's the best way to find people -- and we got new

15  addresses.  Then we sent -- where we got new addresses, we sent

16  another mailing.

17          If we didn't get through that way, I note that our

18  paralegals tried every phone number in the Accurint phone

19  system to locate people.  There were some people -- it is no

20  surprise that it was 19 in the file papers but now it's 20, but

21  whatever the number -- there were some people that we could not

22  find actual addresses -- we could not find actual -- and

23  confirm that they, at least, got a notice in their mailbox.

24  Not confirm whether they read it or anything, but that it even

25  was delivered to them.

1          Now, the question is what do you do about that.  In

2    every case -- and the Peters case stands for exactly the

3    proposition that we cite it for, and there is a line of Supreme

4    Court cases that we cite in our brief.  In every case it has

5    consistently been held that it is sufficient notice to send

6    somebody a letter by first class mail.  We went the extra mile

7    and tried to get new addresses and sent new letters, and tried

8    even calling people on the phone, but the fact is that first

9    class mail is sufficient, as a matter of due process, even

10   though we all know that not everybody, you know, is going to

11   get a first-class mailing because people move, et cetera, et

12   cetera.

13          So the idea that there is some requirement that we do

14   something additional -- and I think it's notable, there's

15   really not a lot of specificity about what that would be.  Our

16   investigation indicates that these are former employees.  So

17   posting something at Boston Harbor Cruises' time clock or

18   something wouldn't be particularly helpful, and Ms. O'Neal

19   probably would oppose that anyway.  Putting an ad in the Boston

20   Globe, the Supreme Court and everyone knows those notices are

21   largely fiction, especially dealing with a class like this

22   that's not, you know, banks or someone likely to check those

23   sorts of legal notices.  So we did what due process requires to

24   notify them.

25          If for some reason the Court were to disagree with

1   that -- and I would submit our papers make it clear that that

2   just would be in error -- then the proper recourse would be, I

3   suppose, to require some additional notice.  I'm not sure

4   exactly what form that would take.  We could put an ad in the

5   paper, but I think we all know that that would be an effort

6   that would be futile and would serve really no purpose, and the

7   Constitution doesn't require it.

8        So I think my first point is we don't need to do this,

9   and my second point and larger point is that even if we were

10  required to do this, we have plenty of time in this case to

11  issue whatever additional notice the Court deems appropriate,

12  and we could do it and there's no reason to exclude people's

13  claims.

14       Let me just mention the issue you asked about pro rata

15  distribution.  Respectfully, I would disagree with that

16  approach.  We would argue that what's required under the law is

17  the damages amount would be a total.  If there are unclaimed

18  funds, we would argue that would go to a cy-pres.  So

19  Ms. O'Neal is correct that if these people are included and she

20  loses, her client will have to pay more money.  She may not pay

21  it to these people, it may go to a charity or something, but if

22  I understand, that's the law in Massachusetts and what we would

23  ask for.  On the other hand, if she wins, she'll have more

24  people bound by the judgment.  Of course, since these people

25  are difficult to find right now, it's probably accurate that

1   they wouldn't file lawsuits anyway.  But that is what the

2   dispute is about.

3        But I think the key thing is we complied with the due

4   process requirements for notice, and you shouldn't be allowed

5   to use the fact that people move as a reason to exclude them

6   from the class.  If anything, I guess we'll put an ad in the

7   Globe or something, but it's not going to make any difference

8   as a practical matter.

9        I will just mention on this opt-out issue because it

10  was raised, I have done class actions for most of my career in

11  the defense and plaintiff's side, 55 opt-outs out of 400

12  employees is an extraordinary number, especially since, as

13  counsel conceded, these are not cases where these opt-outs have

14  any realistic possibility of pursuing their own claim.  These

15  are people who, for reasons that are difficult to fathom,

16  voluntarily decided to give up any chance they might have to

17  get money in this case.  And normal -- as we put in our

18  papers -- typical opt-out rates are maybe 2 percent, sometimes

19  they're as low as one in a thousand, but 12 percent is

20  extraordinary.  And the number is so high, frankly, that just

21  the number alone raises questions about what was happening over

22  at Boston Harbor Cruises that employees felt like they had to

23  voluntarily give up their right to money that they have no

24  other means of getting on their own.

25        And I will note, as Mr. Urmy's declaration makes

1    clear -- and I apologize he's not here himself; he had a

2    long-scheduled trip abroad -- but as Mr. Urmy's declaration

3    makes clear, we were advised by an employee that

4    Mr. Nolan -- that Mr. Nolan asked him to opt out, and that when

5    he said he did not want to opt out there was no further

6    conversation about it, but that he was terminated a week later.

7    And discovery is ongoing; we're investigating it.  If, you

8    know, we get to a point that we want to bring that separately

9    to the Court's attention, we will, in a more formal way, but I

10   do think we have to recognize that the number of opt-outs in

11   this case is extraordinary as a percentage.

12          THE COURT:  Do you know how many of the opt-outs are

13   current as opposed to former employees?

14          MR. TOMPKINS:  I don't have that information handy,

15   but I did look and I believe it's a fairly high number.  I

16   know, for example, that we have, you know, relatives of the

17   defendants that have opted out, current employees have opted

18   out.  I can get that number for the Court, though, if you would

19   like.

20          THE COURT:  Okay.  I think I understand.  I don't know

21   that that issue is raised here or affects the decision in this;

22   that is, any pressure to opt out.  That may be an issue, but

23   it's not something that's raised by the present motion.

24          It seems to me that it is clear that there are, I

25   guess, 20 people -- although it used to be 19, but I guess now

```
 1   it's 20 -- as to whom there is no reasonable evidence to

 2   suggest they know of the opportunity to opt in or out.  Well,

 3   one of them, I guess, has opted -- put aside the overlap

 4   person.  Those persons who have not opted in and who have not

 5   received the actual notice, there's no reason to think they

 6   know anything about this suit -- they have any notice.  There's

 7   no reason to think they have actual notice.  There was no

 8   backup form of notice, however effective it might be.  And

 9   there are various techniques of effectiveness.

10            MR. TOMPKINS:  May I --

11            THE COURT:  But it seems to me that there's

12   simply -- now, so I think they have to be excluded.  I think

13   it's fair to them.  You can argue what's fair to them.  I guess

14   it depends on who you think is going to win the case.

15            But they have, I think, the opportunity -- under due

16   process they ought to have the right to make that choice for

17   themselves.  As to the question whether there should be a redo,

18   I think that's -- it's too late for that.  We considered the

19   kind of notice that should have been given, both parties

20   suggested this as the method, and it seems to me that we stick

21   with the method that we set.

22            So I think we go forward with those who have been

23   served, then notified, and have not opted out who will

24   constitute the Rule 23 class.

25            MR. TOMPKINS:  Your Honor, may I be heard on this?  I
```

1  know -- I don't want to take much longer because I understand

2  you've spoken here, but it really is critical -- the last thing

3  you said -- we agreed on this form of notice.

4        THE COURT:  Right.

5        MR. TOMPKINS:  This is something the defendant -- this

6  is litigation by ambush.  I mean, they said that sending a

7  first class letter was fine, and we had every reason to believe

8  it was fine because everyone knows that publishing something in

9  the Globe is a fiction.  No one is going to read that article.

10  And so now --

11        THE COURT:  It wasn't just that because, as Mr. Urmy

12  indicated, he didn't want to spend the money to do that.

13        MR. TOMPKINS:  Well, that's true, too.  But I'm just

14  saying the defendants didn't ask for it.  Had they said at the

15  outset, "We will raise a due process issue if you don't put

16  this ad in the Globe" that no one's going to read, we probably

17  would have agreed to it.  But now to come at this point, after

18  having agreed, and make this motion --

19        THE COURT:  I don't think that's an unfair surprise.

20  Anyway, the motion's granted for the -- at least for the 19.

21        Now, let me consider separately the person who has

22  already opted in.  There's a person who does have notice of the

23  suit, I think.

24        MS. O'NEAL:  Mr. Urmy's declaration that he filed in

25  opposition to my motion identified the 20th person who I had

1   not had any knowledge of prior.  That's Chaz Durham.  He hadn't

2   been on any list previously that Mr. Urmy had provided to me,

3   so I didn't know he had not received the mailing.

4          THE COURT:  Right.

5          MS. O'NEAL:  Mr. Urmy indicates that he did receive

6   the mailing but that the mailing was returned to Mr. Urmy's

7   office, actually, well after the opt-out date.  I think it was

8   actually, your Honor, maybe October or November.  The opt-out

9   date was mid-July.  That individual, Chaz Durham, had, in fact,

10  opted in.

11         Now, what also happened with Chaz Durham is that he

12  had failed to answer -- if I recall correctly, he failed to

13  answer discovery.  And in any event, your Honor had since

14  dismissed him from the case because he failed to do something,

15  and I think that something was answer discovery.

16         MR. TOMPKINS:  I have no --

17         THE COURT:  Well, if he -- okay.

18         MS. O'NEAL:  So he was in and then he was out.

19         THE COURT:  And the timing may matter.  The dismissal

20  was last August --

21         MS. O'NEAL:  I believe that's right, your Honor.

22         THE COURT:  -- operating from memory?

23         MS. O'NEAL:  I believe that's right.

24         THE COURT:  Somewhere in that range?

25         MR. TOMPKINS:  Your Honor, I don't have any

1    information about Chaz Durham available specifically, but I

2    would say that if anyone's opted in to the case, they do have

3    notice of the case.

4          THE COURT:  Well, but the timing may -- actually, it

5    may have been August of '08.

6          MS. O'NEAL:  I actually think it was '08.

7          THE COURT:  Yeah.  Because last summer is when the

8    notices were going out.

9          MS. O'NEAL:  That's right.  Notices went out --

10         THE COURT:  So I think it was the summer before -- let

11   me go back...

12         (Pause.)

13         THE COURT:  Well, I see a motion -- it was filed back

14   in April of '08 -- to dismiss the claims of Edward F. McGrail

15   and Gail M. Crane for failure to comply with the court order

16   regarding discovery.  And that -- I just would say it appears

17   to be only two.

18         MS. O'NEAL:  And then, your Honor, what had happened

19   is that, as a result, I believe -- my memory might be

20   faulty -- I know this happened with respect to some folks, what

21   I'm about to tell you.  There were interrogatories that your

22   Honor ordered be answered within a certain period of time.

23   They were not.  Mr. Urmy filed dismissals on behalf of those

24   opt-in plaintiffs.  And that may have been Mr. Durham.  I had

25   filed a motion --

1          THE COURT:  You mean without contesting --

2          MS. O'NEAL:  Correct.

3          THE COURT:  So that the motion was only necessary as

4     to others?

5          MS. O'NEAL:  Right.

6          THE COURT:  Oh, here.  Wait a minute.  There it is:

7     102.

8          MS. O'NEAL:  Because I gave him an extension to get

9     them answered, if I recall correctly.

10          THE COURT:  Yeah.  Stipulation of dismissal by counsel

11     for both sides.  So it's a Rule 41(a)(1)(A)(ii).  That the FLSA

12     claim asserted by opt-in plaintiffs, Chaz Durham and others, be

13     dismissed.  That was March 27th, '08.

14          Now, no separate order of judgment was entered with

15     respect to Mr. Durham, but it may -- it does, I think, affect

16     whether he could be thought to have constructive notice of a

17     case he's been kicked out of.  That's the -- I mean, because he

18     didn't get actual notice; he didn't get the mailing.  So the

19     question is:  By his status as an opt-in plaintiff, does he

20     have constructive notice of the class notice?  And I think

21     since he had been kicked out, if I can be casual about it,

22     before that, it's not reasonable to presume that he did have

23     constructive notice.

24          MR. TOMPKINS:  Your Honor, respectfully, I think that

25     the complaint in the case alleges violations of Massachusetts

1    law.  And so even though he eventually was dismissed from

2    the -- he was aware that Massachusetts law --

3         THE COURT:  He was aware of the case, but he wasn't

4    aware of the class notice and the opt-out opportunity.

5         MR. TOMPKINS:  But he indicated his interest to be

6    involved in the Massachusetts case by opting in and --

7         THE COURT:  Until he stipulated his dismissal out.

8         MR. TOMPKINS:  From the federal claim.

9         THE COURT:  Right.

10        MR. TOMPKINS:  Which is an important distinction

11   because --

12        THE COURT:  It is but --

13        MR. TOMPKINS:  -- that subjects him to discovery,

14   potentially, whereas the Mass. claim does not.

15        THE COURT:  Well, I suppose.  He's not a named

16   plaintiff --

17        MR. TOMPKINS:  That's correct.

18        THE COURT:  -- and he had opted in pursuant to the

19   FLSA notice.

20        MR. TOMPKINS:  That's correct.

21        MS. O'NEAL:  And the class --

22        THE COURT:  So I don't know whether -- that doesn't

23   necessarily make him a -- he's not a party to the 23 -- Rule 23

24   action until he becomes a member of the class.

25        MR. TOMPKINS:  But when he opted in, he knew the claim

1   included Rule 23 claims under Massachusetts law --

2          THE COURT:  And then he absented himself which

3   prevented him from getting notice of the class procedure.

4          MS. O'NEAL:  And the class --

5          MR. TOMPKINS:  Potentially.

6          MS. O'NEAL:  The class was certified -- and I've only

7   got one sheet from the docket -- in early '09.

8          THE COURT:  Right.  So, I mean, you could say, I

9   suppose, in some broad sense, that the world has notice of our

10  dockets now because they're on the web, but I don't think that

11  would satisfy the Constitution.

12         Well, we'll see.  But anyway, so I think he can be

13  included in the exclusion.

14         So the motion is granted as to the 20.

15         MS. O'NEAL:  Thank you, your Honor.

16         MR. TOMPKINS:  Thank you, your Honor.

17         THE COURT:  All right.  Now, with respect to the

18  timing.  You have an issue you want to brief, and that affects

19  the timing?

20         MS. O'NEAL:  Yes, your Honor.  We have -- pursuant to

21  the court order about exchanging expert reports, we had

22  identified three experts that really crystallized -- and I will

23  let Attorney Tompkins speak for himself.  But we've had

24  discussions -- crystalized for the plaintiff that, yes, indeed,

25  there may be an issue that would be dispositive of the matter.

1           There are federal statutes and federal regulations

2     applicable to these vessels.  They're called "small passenger

3     vessels."  They must be inspected by the Coast Guard, and the

4     Coast Guard must issue a certificate of inspection.  The

5     certificate of inspection dictates the minimum manning

6     complement of crew who must be onboard that vessel or that

7     vessel does not get to transport its passengers.

8           So the argument will be that that -- for certain means

9     that they are onboard those vessels as an aid in the operation

10    of the vessel as a means of transportation, which is the

11    definition, if you will, or one of them, under the FLSA seaman

12    exemption.  So I think that, your Honor --

13          THE COURT:  Typically by being included in the count

14    regardless of their function on the vessel?

15          MS. O'NEAL:  Well, yes.  But we will also argue what

16    their functions on the vessel are and that they are maritime

17    seaman duties.

18          Now, from my client's perspective, your Honor, this

19    case has been extraordinarily expensive, financially and

20    otherwise.  And if we can avoid having a trial on this matter,

21    because there is a case dispositive issue that has been

22    crystalized as a result of the expert reports we have served,

23    it makes great sense to both sides, believe it or not, that we

24    attempt to address it on a summary judgment basis.

25          Now, if the summary judgment gets rid of, let's say,

1    part of the case, let's say your Honor says, "I agree with the

2    defendants' position, but only with respect to the deckhands; I

3    don't agree with the defendants' position with respect to the

4    galley staff" -- although galley and deckhands are part of the

5    minimum COI mandated crew.  We have also agreed that it makes

6    sense to attempt to mediate the issue.  And in that regard, we

7    have suggested to the Court jointly that the scheduling order

8    be amended.

9        Now, without any criticism about not having been heard

10   until today -- none whatsoever, your Honor -- we did want for

11   me to have 30 days to do that, for an appropriate time for

12   Attorney Tompkins' office to respond.  So the dates that we had

13   provided your Honor on January 22nd, we'd just like to push

14   them out so that I have 30 days and he has an appropriate time

15   to respond.

16       And that's what we would like your Honor to consider

17   today.

18       THE COURT:  So that's for the motion practice?

19       MS. O'NEAL:  Pardon me, your Honor?

20       THE COURT:  That's for the summary judgment motion?

21       MS. O'NEAL:  Correct.  Correct.

22       MR. TOMPKINS:  Yes.  And I think, while we disagree on

23   the proper outcome -- I mean, it's obviously our view that

24   whatever the Coast Guard regulations are, are wholly irrelevant

25   to whether someone is paid overtime.  The fact that they're

1    required to be there by one statute doesn't have anything to do

2    with whether they're paid overtime or not, and we'll argue

3    that.  And certainly if Ms. O'Neal wins, the case will be

4    simplified quickly, at least at your level, and if we win, we

5    think that it will simplify the evidence in the case.  And

6    hopefully, I think both parties agree, will lead to at least

7    some reasonable prospects for remediating a conclusion.  So I

8    think we both agree it's the right process to go through.  And

9    I have no objection to the 30 extra days.

10           THE COURT:  Yeah.  Let me -- I'm not trying to limit

11   the scope of the motion; I just want to understand it.  This

12   Coast Guard regulation issue:  Did I understand you to say you

13   might also move with respect to the -- whatever facts have been

14   developed about the duties of people?

15           MS. O'NEAL:  Well, yes, your Honor, because clearly I

16   know my opponent well.  They're very good lawyers.  I know that

17   they're going to say, "Okay.  We agree that the certificate of

18   inspection requires X number of crew to cover X number of

19   passengers."  And that's how it goes:  The more passengers you

20   carry, the more crew you need.  And that makes no difference

21   under the FLSA, and it's all about the duties.

22           So clearly anticipating that, I will put in an

23   argument about the duties should your Honor not be convinced

24   that the COI does the trick.

25           THE COURT:  Okay.  I have to see the motion, I guess.

1  That's fine.  I just have in mind what the circuit said, which

2  was this is a fact-specific issue to be judged by standards

3  which are yet to be developed, I guess.  So I don't know -- I

4  don't know whether -- anyway, I'll just leave that.

5           MR. TOMPKINS:  Yes.  And certainly --

6           THE COURT:  Go ahead.

7           MR. TOMPKINS:  I was going to say Ms. O'Neal is

8  correct that we're not going to dispute certain of the facts

9  related to the certificate of inspection requirements; we will,

10 unsurprisingly, dispute, likely, most of the facts of the job

11 duties.

12          THE COURT:  Right.  Okay.  So for -- I'm looking at

13 the previously submitted dates.

14          MS. O'NEAL:  Your Honor, may I tell you what the new

15 dates would be?

16          THE COURT:  Yes.  I'm looking at Paragraph 7.

17          MS. O'NEAL:  March 26th.

18          THE COURT:  Okay.  Paragraph 8?

19          MS. O'NEAL:  April 16.

20          THE COURT:  Okay.

21          MS. O'NEAL:  Paragraph 9:  April 30.

22          THE COURT:  Okay.

23          MS. O'NEAL:  And then your Honor's pleasure as to a

24 hearing date.

25          THE COURT:  Yeah.  We'll have to look and set that up.

1   But we will have in mind the need to move this along.

2          Okay.  So we'll set those three dates for motion,

3   opposition and response.

4          MS. O'NEAL:  Thank you, your Honor.

5          THE COURT:  Okay.  Thank you.

6          THE CLERK:  All rise.

7          (The Court exits the courtroom and the proceedings

8   adjourned at 3:43 p.m.)

9

10                    C E R T I F I C A T E

11

12          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

13   the United States District Court, do hereby certify that the

14   foregoing transcript constitutes, to the best of my skill and

15   ability, a true and accurate transcription of my stenotype

16   notes taken in the matter of Civil Action No. 06-11299, Chris

17   McLaughlin, et al, v. Boston Harbor Cruises, et al.

18

19   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
20   Official Court Reporter

21
     Date: 2/26/10
22

23

24

25