UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

_____
                                          )
CHRIS McLAUGHLIN and                      )
SANDRA McGRATH,                           )
Individually and on Behalf of             )
All Other Persons Similarly Situated,     )
        Plaintiffs                        )        CIVIL ACTION NO.
                                          )        NO. 06-CA-11299-GAO
v.                                        )
                                          )
HARBOR CRUISES LLC,                       )
NOLAN ASSOCIATES LLC                      )
(both d/b/a "Boston Harbor Cruises") and  )
FREDERICK L. NOLAN, III,                  )
        Defendants                        )
_____ )

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the defendants, Harbor

Cruises LLC, Nolan Associates LLC and Frederick L. Nolan III (collectively "BHC") have filed

their Motion for Summary Judgment seeking the entry of summary judgment as to the overtime

pay claims asserted by the plaintiffs, on behalf of themselves and all of the persons similarly

situated ("plaintiffs"), under the Fair Labor Standards Act ("FLSA") and the Massachusetts

overtime statute at M.G.L. ch. 151, §1A.   In support of the motion, BHC submits this

Memorandum of Law, and accompanying Exhibits.

## UNDISPUTED FACTS[1]

### A.     Background

BHC operates passenger vessels in and around Boston Harbor and surrounding areas. These vessels, currently numbering 20, transport passengers between fixed destinations (e.g. BHC operates commuter runs (of 114 runs per weekday) between Hingham and Rowes Wharf, Boston and between Long Wharf, Boston and the Charlestown Navy Yard).   The vessels also transport passengers travelling between Boston and Provincetown.   BHC vessels also transport passengers on whale watches to areas in Massachusetts Bay, with vessels leaving from both Boston and Provincetown.   In addition, a BHC vessel known as "Codzilla" transports passengers from Boston to locations in Boston Harbor, on a family entertainment adventure.   BHC vessels also transport passengers from Boston to locations throughout Boston Harbor and Massachusetts Bay for private cruises for various celebratory outings (e.g., weddings, parties, etc.).   **Ex. A, Nolan Affid. ¶ 3**.

BHC's vessels are between 34 and 126.8 feet in length; weigh between 22 and 99 gross tons, and are constructed with as many as three outside passenger decks.  Three of BHC's vessels are high speed catamarans, which can reach up to 40 knots of speed, being the equivalent of 45 miles per hour.  From 2006 through 2009, BHC's vessels transported 1,300,000 passengers annually on average.  **Ex. A, Nolan Affid. ¶ 3**.

---

[1] The undisputed facts are established through the affidavit of the defendant, Frederick L. Nolan, III (Exhibit A), the expert reports of Edward O. Coates (Exhibit B), David C. DuBois (Exhibit C) and Willard A. Burpee (Exhibit D), the deposition testimony of named plaintiffs Sandra McGrath (Exhibit E), Sandra McGrath's answers to interrogatories (Exhibit F) and the deposition testimony of named plaintiff Chris McLaughlin (Exhibit G). References in this Memorandum to the supporting material are identified by the corresponding exhibit number assigned to the material, as well as the document's name, and corresponding page or paragraph number and, if applicable, the referenced affidavit exhibit number (e.g., "Ex. A, Nolan Affid. ¶15, Ex. 8").  In addition, citations to supporting material are grouped at the end of the paragraphs to improve the readability of the text.

All of BHC's vessels used in the transportation of passengers (the only form of transportation undertaken by BHC)[2] constitute "small passenger vessels" under federal law.  As such, they are subject to statutory and regulatory authority enforced by the United States Coast Guard ("USCG").  Under the statutory and regulatory authority, the USCG conducts inspections of each of BHC's vessels and dictates, among other things, the class, type and number of lifesaving equipment (e.g., life preservers, life rings buoys and EPIRB, which stands for "emergency position indicating radio beacon," devices) and firefighting equipment (e.g., fire pumps, fire hoses, fire axes, fixed and portable fire extinguishing systems, and fire extinguishers) required to be on board the vessel; the maximum number of passengers that the vessel may transport; the specific routes over which the vessel is permitted to operate; and the "minimum" complement of licensed individuals (e.g., licensed captains) and licensed or unlicensed crew (e.g., deckhands), which *must be aboard* in order that the vessel be operated for the transportation of passengers.  The USCG determines the minimum complement of licensed individuals and crew by the process of inspecting each vessel and issuing a certificate of inspection ("COI") which indicates (and dictates), among other things, the minimum complement of officers and crew[3] necessary for the vessel's safe operation.  Consideration is given to, among other things, emergency situations, the size and type of the vessel, its installed equipment, the proposed routes of operation, the type of service in which the vessel is employed, the degree of its automation, use of labor saving devices, wind speed, distance of the vessel from shore, and its organizational structure.  The exact number and type of crew is also tied

---

[2] For example, BHC vessels are not operated for the purpose of transporting only cargo or other goods and products. **Ex. A, Nolan Affid. ¶ 3**.

[3] The USCG, as noted on the vessel's COI, requires a specified number of marine crew employees identified by title including, with respect to BHC's vessels, a master, deckhands, and licensed mates.  Except for the master (i.e., the captain, of which there is only one required per vessel) the number of deckhands and licensed mates (if required) is directly tied to the number of passengers being carried on the vessel.  **Ex. A, Nolan Affid. ¶¶ 5-7, Ex. 1(a)–(t)**.

specifically to the number of passengers to be transported by each vessel.   **Ex. A, Nolan Affid. ¶ 6; Ex. 1(a)-(t); Ex. B, Coates Report, p. 3; Ex. C, DuBois Report, p. 3; Ex. D, Burpee Report, p. 2**.

Upon issuance of a COI to a vessel, it may not be lawfully operated and BHC does not operate it, unless it has in its service and on board, the complement of crew required by the COI. The vessel's master (which in the case of BHC's vessels is a licensed captain) is responsible to ensure the proper manning of his vessel in accordance with applicable laws, regulations and the COI.  If crew members as to type (e.g., deckhand, senior deckhand) and in number required by the vessel's COI are not on board, BHC cuts off the number of passengers and does not board passengers in numbers exceeding those limited by the COI for the corresponding number of crew on board.  Significantly, BHC does not sail with crew members in excess of the minimum number of crew required by the COI.  **Ex. A, Nolan Affid. ¶¶ 6, 8, 25; Ex. B, Coates Report, p. 3; Ex. C, DuBois Report, pp. 6-7; Ex. D, Burpee Report, p. 2**.

B.     **BHC'S Deckhands' Duties and Training**

BHC's deckhands perform their duties and responsibilities almost exclusively on the vessel.[4]  **Ex. A, Nolan Affid. ¶16.**

(i)     **Duties**

Deckhands are required to demonstrate a good working knowledge of all duties and responsibilities described in the BHC Crew Member Orientation and Training Manual, including the successful completion of practical training checklists and having been trained in the operation of all safety and emergency equipment on board the vessel.

---

[4] Occasionally, deckhands shovel snow or clear ice from the gangways used by the passengers to board and disembark the vessels, as well as the dock areas surrounding where passengers board and disembark the vessels. **Ex. A, Nolan Affid. ¶16**.

MCT/244760.1

Every deckhand must be proficient in vessel operation and maintenance duties, handling lines (including knot tying), standing watches on the bridge, as well as in the handling of fire fighting and lifesaving equipment and responding to emergencies.  The general duties of a deckhand include: (a) reporting to the Master (i.e. the captain) for vessel operations, including vessel and equipment functionality and safety procedures for the safe transportation of passengers; (b) reporting to the captain or the senior deckhand, if there is one, for maintenance, stores handling, line handling; (c) performing lookout duties, bridge watch standing, anchor watches, and gangway watches; (d) performing housekeeping duties; (e) performing routine vessel maintenance and cleaning, and other related activities; (f) picking up trash or debris or potentially injury-causing material or matters on passenger decks; (g) sweeping and mopping decks in assigned areas; (h) maintaining the vessel in a clean and sanitary condition; (i) performing security sweeps of the vessel before passengers board for the first trip in the morning, in between trips, and following the last trip of the day; (j) performing USCG-required passenger head counts and reporting head counts to the captain; (k) performing security/safety patrols of passenger decks while the vessel is underway; (l) communicating with passengers, answering questions and responding to complaints; (m) overseeing, monitoring or performing the boarding and disembarking of passengers, which includes positioning, securing and removing the gangways over which the passengers traverse while boarding and disembarking; (n) making USCG-required passenger safety announcements prior to departures; (o) performing any other tasks necessary to keep the vessel clean, safe, and in good order; (p) assisting passengers aboard and ashore; and (q) assisting in taking on fuel and black water removal; (r) taking on potable water; (s) assisting the captain in the navigation of the vessel; (t) assisting in receipt and delivery of supplies to proper storage areas; (u) monitoring activities of passengers and reporting unsafe

conduct or conditions to the captain; (v) having a working knowledge of all aspects of bridge equipment and alarms and required responses; (w) handling vessel lines and mooring the vessel; and (x) emptying trash receptacles (which is especially important because trash receptacles pose a potential fire hazard) and the removal of trash from the vessel and its proper disposal onshore.

The duties of all BHC deckhands are performed nearly exclusively onboard the vessels or, prior to and when passengers are boarding or disembarking, on the docks immediately adjacent to where the vessels are tied up. Occasionally, deckhands will be assigned to shovel snow from the dock areas where passengers board and disembark to ensure passenger safety. They move trash from the vessel to shoreside trash receptacles located nearby to the docks. Deckhands perform *no duties onshore*, such as undertaking odd jobs in or around BHC's offices, or maintaining or repairing BHC's buildings and grounds.

The deckhands are required to conduct inspections of passenger decks and other public areas before, during, and after the vessel has left the dock, as well as inspections of non-public areas of the vessel. Certain of the deckhands conduct engine room inspections which include the monitoring of pilothouse gauges as well as gauges and general conditions in the engine room proper. Readings from gauges are noted and anything unusual is logged and reported to the captain. During an engine room inspection, the gauges for both the main engines and the generator sets are monitored. The main engine gauges measure fuel pressure, lube oil pressure, gear oil pressure and water temperature. The generator set gauges measure fuel pressure, lube oil pressure and water temperature. The main electrical panel is equipped with gauges measuring volts, amps and hertz (cycles). Deckhands must be knowledgeable about the normal operating parameters on all gauges aboard. Similarly, the engine room inspection will include inspection of fuel lines, lube oil lines and water lines, checking for any visible damage such as

6

chafing or leakage, excess vibration or looseness, as well as abnormal odors and noises.  The stuffing boxes, located at the through hull fitting where the shaft passes through the hull, are also inspected.  Deckhands must watch for and be aware of excessive leakage, which could lead to high water level in the bilge.  The level of water and other liquids in the engine room bilge is monitored constantly.  Excessive leakage from stuffing boxes, broken fuel or water lines and lube/gear oil leaks can create a problem with high bilge levels, as all liquids onboard the vessel generally go into the bilge.  Fuel or oil in the bilge is always a fire hazard, and in extreme cases, high bilge levels can lead to problems with vessel stability.

Certain of the deckhands also inspect battery banks, which are inspected on board the vessels daily.  Leads and connection are inspected for damage and electrolyte levels in batteries must be kept above the wet cells.  Distilled water only is added to the batteries when necessary.  All below deck voids and compartments are also checked for excess water at least weekly.  In addition, the machinery contained in these voids (steering gear, water tanks, pumps, etc.) is inspected for proper operation.  As to which deckhand performs which function on a given shift, is by order of the captain or the senior deckhand, if there is one.

Deckhands are also trained in life-saving and fire-fighting equipment handling including life jacket and personal flotation devices, life buoys, and other rescue equipment (e.g., Jacob's ladders).  Deckhands are required to understand the use of fire extinguishers and are responsible for their inspection to make sure they remain properly charged.  They are trained in what type of extinguisher to use for what type of fire.  In addition, they are trained on the manning of the vessel's fire station.  A fire station consists of a fire hydrant (a water outlet) with a valve and associated hose and nozzle.  The deckhands are trained in the use of a fire ax and must understand how to operate the emergency fuel shutoff which is to be used in the case of a major

engine room fire.  The deckhands are trained and instructed in the proper procedures for dealing with accidents and emergencies including medical emergencies, man overboard, fire on board, abandon ship and collision procedures.

The galley is an area located on the main passenger deck of the vessel, from where food and beverages are sold at certain times during a vessel's operation when passengers are being transported.  However, not all of BHC's vessels have galleys that are operational and staffed. For example, BHC's vessels that are used to transport passengers between Long Wharf and the Charlestown Navy Yard have galleys, but they are not operational.  Therefore, no deckhands aboard such vessels are assigned to the galley.  For those vessels with operational galleys, no food is prepared in the galley or packaged onboard.  Rather, all food (e.g., donuts, muffins, potato chips, peanuts, pre-packaged sandwiches) and beverages (soda in cans, juice in cartons, beer in cans, wine in single serve containers) are pre-packaged and pre-prepared.

The galley itself is typically three-sided, approximately 38 inches in height, behind which the deckhand working in the galley sits or stands.  The galley is equipped with the only telephone located aboard BHC's vessels, which has a direct line to the wheelhouse, permitting the reporting of emergencies and other matters requiring the captain's immediate attention.  Being located on the main deck, where the greatest number of passengers sit, the deckhand working in the galley is uniquely positioned to observe passengers and report passenger and vessel issues and emergencies.

Galley staff are deckhands that are assigned on a particular shift to the galley.  They have all of the same job qualifications and training as listed above for deckhands, as they are deckhands.  Even when a deckhand is assigned to the galley, s/he assists other deckhands with line handling and mooring operations, performs housekeeping duties, picks up trash on passenger

decks, vacuums or sweeps or mops decks in assigned areas, assists with loading and unloading of passengers when necessary, empties trash receptacles, and performs any other duties assigned by the captain.  In addition to the general deckhand job duties, galley staff duties also include: (a) setting up of galley/concession stand; (b) responsibility for cleanliness and order of galley area; (c) responsibility for maintaining proper stock of galley supplies; (d) responsibility for bank and register operation; (e) responsibility for smooth operation of galley/concession stand throughout the voyage; and; (f) maintaining the galley in a clean and sanitary condition.

Even when assigned to the galley, galley staff remain responsible for passenger safety and responding to all emergencies relative to the vessel and her passengers.  As such, galley staff take part in all crew safety and emergency drills.

. Deckhands are selected to work in the galley by the captain or the Operations Manager. Some deckhands enjoy working in the galley so some of the captains or Operations Managers will accommodate that preference and assign certain deckhands to the galley on a regular basis. However, all crew members hired as deckhands, including those attending to the galley, are expected to work as assigned by the captain.

Consistent with Navigation and Vessel Inspection Circulars ("NVICs"), which are issued by the USCG to the marine industry to inform and clarify USCG regulations, specifically No. 1-91, which specifically permits the assignment of deckhands to concessionaire, waitress or waiter duties, so long as they can readily respond to their regularly assigned deckhand duties, BHC assigns members of the COI mandated deckhand crew to the galley.

BHC's deckhands wear special uniforms that designate their position as a member of the crew through the color of their company-issued polo type shirt, sweatshirt and jacket which have the BHC name, logo and, on the shirt, the word "crew" labeled on it, and other required attire

(e.g., Khaki pants or shorts).  This is done so that they can be easily identified by passengers as marine crew members.  **Ex. A, Nolan Affid. ¶¶ 7, 16-23, Exs. 3, 6**.

       **(ii)**     **Training**

USCG regulations do not require deckhand crew members to be licensed, nor do the regulations mandate that particular training be provided to deckhands.  However, NVIC No. 1-91, addresses recommended qualifications for small passenger vessel deckhands, including recommended training.  BHC complies with NVIC No. 1-91, and indeed, in the COIs for certain of BHC's vessels, the designated senior deckhand is required by the COI to be trained as per NVIC No. 1-91.  In addition, in the COIs for certain of BHC's vessels, it is also mandated that BHC provide crew training in accordance with BHC's internal Crew Member Orientation and Training Manual, which has been reviewed and approved by the USCG, with which BHC also complies.

All BHC deckhands (and all other crew subordinate in rank to the captain) are under the direction and authority and control of the captain.  In accordance with USCG recommendations, BHC trains its deckhands on vessel operations, including equipment and navigation systems, and marine and passenger safety.  BHC maintains vessel logs for each vessel, which note, among other things, the conduct of safety and emergency training drills and consistent with USCG regulations, BHC posts "Station Bills" throughout each vessel that describe the specific safety responsibilities of the crew in the event of various types of emergency situations (e.g., man overboard, fire on the ship, etc.), and BHC instructs deckhands on the emergency procedures set forth in the station bill for each vessel.

After the September 11, 2001 terrorist attacks ("9-11"), the USCG required small passenger vessels, which include all of BHC's vessels, to implement an approved highly

confidential security plan (referred to by the USCG as a Security Sensitive Document) which sets forth various homeland security responsibilities. The plan requires BHC to train crew members on how to deal with suspicious activities, bomb threats, suspicious devices, and other homeland security issues. These requirements were issued by the USCG acting under authority of the Maritime Transportation Security Act of 2002, and they specifically require small passenger vessel operators, as well as others, to develop and implement security measures for the domestic passenger vessel industry, including small passenger vessels and their facilities. As a Security Sensitive Document, BHC's security plan may only be disclosed to persons with a "need to know" as defined in 49 C.F.R. 1520.9. Consequently, crew members, including deckhands, while not being privy to the security plan, are instructed and used to carry out some of the security measures, without necessarily being aware of why certain tasks are being performed (e.g., as part of BHC's security plan).

In addition, after 9-11, the USCG promulgated what is known as MARSEC (which stands for Maritime Security) levels consistent with the Department of Homeland Security's Homeland Security Advisory System ("HSAS"). MARSEC levels are designed to provide a means to easily communicate pre-planned scalable responses to increased threat levels. The Commandant of the USCG sets MARSEC levels commensurate with the HSAS.

MARSEC levels are set to reflect the prevailing threat environment to marine elements, including ports, vessels, facilities, and critical assets and infrastructure located on or adjacent to waters subject to the jurisdiction of the United States. BHC's vessel crew, including deckhands, are responsible for carrying out security procedures, including passenger screening functions, associated with BHC's required responses to MARSEC levels. Such functions include things as simple as BHC's implementation of a ticketing procedure whereby every single person boarding

a BHC vessel, including infants, must possess a ticket in order to be permitted to board, and deckhands are responsible for insuring that each passenger presents a ticket and in collecting a ticket for every passenger who boards.  Previously, this was not the case and children who otherwise travelled free of charge and other individuals, such as known friends of captains or crew, were permitted to board without presenting anything.  Since 9-11, even the seemingly simplest of BHC implemented practices and procedures, the significance of which may not be specifically known to the deckhands, serve safety and security purposes mandated by the USCG and/or BHC.

BHC crew members, inclusive of deckhands who perform as galley staff, carry out marine safety-related responsibilities aboard the vessel *at all times*.  For example, they are responsible for (a) preventing and treating fires, including having knowledge of fire systems on the vessel, including the fire pump, fire hoses and fire extinguishers, bilge pumps, and bilge manifolds; (b) knowing how to utilize life saving equipment; (c) understanding the vessel layout, including exits, egress areas, refuge areas and muster areas for emergency responses; (d) knowing and implementing procedures for the safe boarding and disembarking of passengers, including conducting headcounts;[5] (e) knowing how to operate the emergency fuel shut off; (f) knowing and implementing procedures for the safe use, care and stowage of the vessel's "lines" and the safe untying and tying up of the vessel; and (g) knowing specific safety procedures and duties to be performed in the event of an emergency (as indicated on the vessel's Station Bill).

Pursuant to USCG regulations, any employee who is required aboard the vessel as prescribed by the COI (e.g., all BHC captains and deckhands) are required to undergo a drug test

---

[5] In accordance with USCG regulations, the exact number of passengers must be counted by the crew, reported by a crew member to the Captain, recorded by the Captain in the vessel log book, and reported by the Captain to BHC personnel located onshore prior to every departure of the vessel from the dock.

upon selection for hire, as a condition of hire and then, randomly and based upon reasonable suspicion, during their employment. BHC also tests, as required by USCG regulations applicable to the crew, for the presence of drugs and alcohol in the event of a "serious marine incident," which includes, but is not limited to, collisions, groundings, foundering, etc. In addition, crew members are required to report passenger drug use to the captain. Under USCG regulations, if the captain is aware of drug use on the vessel and is negligent in responding to prevent its occurrence, the vessel may be seized by the USCG.

All crew members hired as deckhands are given on-the-job-training in line handling and mooring operations (ensuring knot tying proficiency), the safe boarding and disembarking of passengers, the securing and monitoring of gangways, and safety and emergency responses. Consistent with USCG regulations, BHC's captains regularly conduct emergency drills to ensure that deckhands are prepared to respond to emergency situations, such as fire, man overboard, and collision. Typically, such drills occur once a month, although certain of them (specifically man overboard and abandon ship) are only required by USCG regulations to be conducted every three months, and others of them are not required to be conducted with any specific regularity (specifically firefighting).

As required by USCG regulation, the drills are logged into the vessel's log book by date, together with a notation of the topic of the emergency training, and BHC's captains also note the names of the participating crew members. As verified by these vessel logs, safety and emergency drills were participated in by both named plaintiffs, Chris McLaughlin and Sandra McGrath once a month, on average.

In addition to captain-initiated safety and emergency drills, the USCG conducts annual and unannounced inspections which include the conduct of emergency drills by crew (i.e. captains and deckhands) to ensure crew knowledge and expertise in the event of an emergency.

**Ex. A, Nolan Affid. ¶¶ 9-15, Exs. 3, 4, and 5; Ex. E, McGrath Depo., p. 66; Exhibit G, McLaughlin Depo., p. 47**.

### C. BHC's Classification of Marine Crew, Including Deckhands, as Exempt Seamen

BHC, like most small passenger vessel companies in the United States known to BHC, classifies its marine crewmembers, including captains and deckhands, as exempt from overtime pay under the FLSA's and the Massachusetts statute's seaman exemption.  BHC openly notifies marine crewmembers when they are first hired that they are considered exempt and that they will receive straight time pay for all hours worked, even if they work more than 40 hours in a workweek.  BHC's employee Wage and Benefit Guidelines provided it to its employees contains a disclosure stating, specifically, as follows:

> Exempt Employees – Exempt Employees are those salaried employees who are executives, administrative, professional or outside sales employees and who meet certain specific criteria as defined by law.  They are not entitled to receive an overtime premium for hours worked in excess of 40 hours in a workweek.  In addition employees employed as "seamen" or "transportation employees" are "exempt employees," and are not entitled to receive payment of an overtime premium for hours worked in excess of 40 hours in a workweek under federal and/or state law.  Among others, employees of BHC employed on board vessels as captains, licensed deckhands, deck engineers, deckhands and galley personnel are exempt.

**Ex. A, Nolan Affid. ¶27, Ex. 7**.

BHC has always classified its marine crewmembers as exempt since when it commenced its business operations in 1926.  Defendant, Frederick J. Nolan, III ("Nolan"), who has been associated with BHC, a family business, since 1977, educated himself on the legal requirements

of the FLSA's seaman exemption and based upon consultation with professional advisors and industry associations and groups, and his industry expertise, he understood the basic requirements of the seaman exemption and also knew that federal regulations expressly stated that "members of the crew" fell under the FLSA seaman exemption.  Accordingly, Nolan was convinced that the classification was compliant with the FLSA, as well as Massachusetts law. **Ex. A, Nolan Affid. ¶¶3, 26-28, Ex. 7.**   .

In addition, BHC's deckhands, including named representative plaintiff Sandra McGrath, have, when injured, received benefits for work related injuries known as maintenance and cure, and have made claims under the Jones Act, which remedies are available and payable only to seamen.  Also, in the past, and presently, BHC was and is a party to two different collective bargaining agreements covering deckhands as members of the collective-bargaining unit. Neither union contract provided for the payment of overtime to the covered deckhands.  **Ex. A, Nolan Affid. ¶¶26, 29, 30.**

## LAW AND ARGUMENT

### A.      As Members of the Vessel's Crew, the Plaintiffs are Seamen

As members of the vessel's marine crew as mandated by the COI, the plaintiffs were required to be on board the vessel as a matter of law.  If not, the vessel could not be operated and her passengers could not be transported.  Federal statutes, regulations, and the COI require that BHC man the vessels with a specified number of operating crewmembers.  The marine crewmembers are required to be present on board the vessel to fulfill specific job duties contained on the vessel's Station Bill in the event of an emergency.  As marine crewmembers, the plaintiffs maintain their safety-related responsibilities *at all times* on the vessel, regardless of whether they happen to be cleaning a window or scrubbing a deck at a particular moment in

15

time.  The presence of the marine crewmembers aboard the vessel, whose presence is mandated by law, in and of itself constitutes the performance of marine related duties.  Simply, were the plaintiffs not on board the vessel, the vessel could not be lawfully operated for its intended purpose of transporting passengers.  Members of the USCG mandated crew, which included the plaintiffs, were the *only* individuals aboard the vessel attending to its operation and the safety of its passengers.  Their presence on board is absolutely necessary to the operation of the vessel. Even if this were not dispositive of the issue at hand, their duties, which are performed virtually exclusively on board the vessel, are rendered as an aid in the operation of the vessel and the safe transportation of the passengers.

### 1.     Recent And Long-Standing Precedent Establish Plaintiffs' FLSA Exempt Status

As members of the crew, the plaintiffs' legal status as seamen is supported by recent and long-standing precedent.  Courts that have addressed the exempt status of seamen under the FLSA have uniformly held that members of the crew of the vessel are employed as seamen and are therefore exempt.  See, *Bolan v. Bay State Dredging & Contracting Co.*, 48 F. Supp. 266, 267, 270 (D. Mass. 1942) (court held that deckhand on a dredge, which at times remained stationary for up to two months, was a member of its crew, where his handling of lines and other duties, including "washing and scrubbing decks," were manifestly important for the safety, and maintenance, and operation of the dredge and therefore was a "seaman" covered by the exemption under the FLSA)[6]; *Louviere v. Standard Dredging Corp.*, 239 F. 2d 164, 165 n. 2 (5th Cir. 1956) (tugboat deckhand who was a member of the crew, and, among other duties "routinely

---

[6] The court's holding in *Bolan* was issued in spite of an interpretive bulletin issued by the Department of Labor's wage and hour division which took a position contrary to that taken by the court.  While the court noted the "great weight" to which the interpretation was entitled, it nonetheless "disagree[d]" with the Department of Labor. *Id*. at 271.

MCT/244760.1

performed by a crew member," "handl[ed] the lines," "ma[de] fast the vessel" and "scrubb[ed] the decks," was exempt seaman under the FLSA). Significantly, in both the *Bolan* and the *Louviere* cases, there was no indication that the presence of the deckhands on board the vessels was statutorily mandated (by, for example, a COI), as is the presence of the deckhands in the instant case.

The case of *Walling v. Keansburg Steamboat Co.*, 162 F. 2d 405 (3rd Cir. 1947) is particularly instructive. In that case, individuals were employed on steamships used to transport passengers between New Jersey and New York. *Id.* at 406. The crew of each vessel was comprised of individuals by type and number *in accordance with the minimum* set by the USCG, as contained in the vessel's COI. *Id.* at 406 n. 1. During the six to seven month off-season, the vessels were put in drydock for a short period of time, following which they were moored at the defendant's docks. *Id.* at 406. While there, crew members performed repairs on the vessels until the next navigation season. *Id.* at 406. As members of the COI mandated crew employed as seamen during the transportation period (i.e. the navigation season), the court held that these same crew members remained exempt seamen under the FLSA during the mooring interval, even though their work, during the off-season, differed "substantially from their duties during the navigation season," and notwithstanding the contrary position of the plaintiff, Administrator of the Wage and Hour Division of the United States Department of Labor. The court differentiated and reconciled to its holding cases cited by the plaintiff where the courts had held that the seaman exemption did *not* include certain workers aboard dredges and lighters based upon the fact, among others, that the dredges and lighters were not inspected by governmental agencies (plainly referring to the USCG, and the issuance to the subject vessel on which the plaintiff worked of the COIs). *Id.* at 407.

More recently, in *Selby v. Yacht Starship, Inc.*, 624 F. Supp. 2d 1367 (M.D. Fla. 2008), the court held that an engineer working aboard vessels operated for purposes of providing lunch and dinner cruises was an exempt seaman.  *Id.* at 1368-69, 1379.  Significantly, the vessels were registered with the USCG and maintained COIs.  *Id.* at 1369.  The plaintiff was a member of the vessel's marine crew mandated by the COI (being a captain, a first mate, two or three deckhands, and an engineer).  *Id.*  Notwithstanding that the plaintiff's training for his duties as engineer was "obscure or disputed or both," and that the plaintiff stated that the bulk of his time was devoted *not* to his engineering duties which included preventative maintenance and very minor repairs on the vessel's engine and mechanical systems (characterized by the court as being "plainly seaman's duties") or to monitoring passenger safety (noted by the court as being a marine duty because it goes to the safety of the vessel), but rather to "general cleaning of the yacht,"[7] the court concluded that the cleaning duties qualified as "seaman's duties, i.e. as service rendered primarily as an aid in the operation of the vessel as a means of transportation."  *Id.* at 1370, 1378.  Acknowledging that while such cleaning duties "undoubtedly improv[ed] passengers' dining experience," importantly, they "were necessary to the safe and efficient operation of the vessel and therefore qualify as seaman's duties, i.e., as service rendered primarily as an aid in the operation of the vessel as a means of transportation."  *Id.* at 1378.

Similarly, in *Godard v. Alabama Pilot, Inc.*, 485 F. Supp. 2d 1284 (S.D. Ala. 2007), the court analyzed whether certain job duties performed by the plaintiffs, who were pilot boat launch

---

[7] Significantly, the court found that in spite of their different job titles, the vessels' marine crew members worked as a team, performing many of the same tasks.  With respect to the general maintenance, monitoring, and cleaning duties performed by the plaintiff, these duties were described in the defendant's job description documents as those to be performed by deckhands.  *Id.* at 1371.  The plaintiff described his "deck hand duties" as consisting chiefly of "cleaning bathrooms, cleaning the hallway, boarding area chairs, floors, just general cleaning of the yacht," stating, "[g]enerally, that's all we did," such that he "considered [himself] a janitor."  *Id.* at 1371-72.

operators[8] constituted "seaman" work under the FLSA.   The court recognized that general

maintenance and cleaning duties performed on the vessel constitute exempt "seaman" work, *even

if* such work would be considered non-seaman work if performed on land and unconnected to a

vessel.  The court stated that:

> [D]efendant asserts that a few of these types of tasks do qualify as seaman's work, such
> as assisting in the general maintenance of the boat and painting and cleaning the pilot
> station.  As to the former, the types of low-grade vessel maintenance at issue here (e.g.,
> checking the fluids on each shift, visually inspecting the vessel for damage, painting and
> cleaning the vessel, keeping the log books, and assisting the port engineer from time to
> time) are, in this context, *clearly services rendered primarily as an aid in the operation of
> the vessel as a means of transportation*... (Emphasis added)
>
> As to the latter, by contrast, the janitorial, painting, and cleaning functions that plaintiffs
> perform around the pilot station [located onshore] cannot reasonably be viewed as having
> any reasonable connection to seaman's work.  As stated repeatedly herein, the test is
> whether the services are rendered primarily as an aid in the operation of the vessel as a
> means of transportation.  Whether launch operators scrub the toilets, clean the windows,
> and polish the stove top in their crew quarters on land does not in any way benefit or
> impact the operation of the pilot boat as a means of transportation.  (*The same may not be
> true if they were performing such functions aboard a vessel at sea*.)  As such, these types
> of duties are simply too attenuated from the operation of the pilot boats to qualify as
> seaman's work under the FLSA test.  (Emphasis added)

*Id*. at 1300.

Cases from the Northern District of Illinois and the Seventh Circuit also support that

cleaning and maintenance duties performed aboard a USCG inspected vessel for which a COI

issues, by COI mandated crew members, are "seaman" duties.  Although the holdings of the

cases are premised on the stated rebuttable presumption that where persons employed aboard a

vessel are classified as seamen for purposes of entitlement to the special employment benefits to

---

[8] The plaintiffs operated, when called upon to do so, one of two small boats, called launches or pilot boats, used to
ferry bar pilots to and from vessels entering or leaving navigable waters, from and to a pilot station located onshore.
*Id*. at 1285-86.  While onshore at the pilot house where the plaintiffs waited to be called upon to operate the
launches, the plaintiffs spent a significant percentage of their on-duty hours on standby, sitting in the radio room,
monitoring the radio and telephone, and waiting for calls requesting that a bar pilot be either picked up or delivered
to another vessel.  *Id*. at 1288.  In addition to the court's analysis of the plaintiffs' maintenance and cleaning duties,
addressed infra, the court also concluded that the plaintiffs' radio watch (i.e. standby) duties qualified as seaman's
work under the FLSA.  *Id*. at 1297-98.

which seamen are entitled (e.g., maintenance and cure obligations owed to seamen injured on-the-job, and the "uniquely liberal" Jones Act liability standards extended to seamen), a presumption arises that they are seamen under the FLSA, the analysis of factors that could rebut the presumption is instructive. *Harkins v. Riverboat Services, Inc.*, 385 F. 3d 1099, 1103 (7th Cir. 2004).

In the *Harkins* case, as well as the case of *Tate v. Showboat Marina Casino Partnership*, 250 F. Supp. 2d 958 (N.D. Ill. 2003), *aff'd* 431 F. 3d 580 (7th Cir. 2005), the courts analyzed the duties of the vessel's operating crew in the context of whether they engaged in maritime related activities and were therefore seamen within the meaning of the FLSA. *Tate v. Showboat Marina Casino Partnership*, 431 F. 3d at 582. The vessel, which was the same vessel in both the *Harkins* and *Tate* cases (*Tate v. Showboat Marina Casino Partnership*, 357 F. Supp. 2d at 1079 n. 4; *Tate v. Showboat Marina Casino Partnership*, 431 F. 3d at 582) was inspected by the USCG, issued a COI, and the plaintiffs were members of the USCG mandated marine crew, which included able bodied seamen, ordinary seamen, fire watchers, or oilers, specified as to type and number by the USCG. *Tate v. Showboat Marina Casino Partnership*, 357 F. Supp. 2d at 1077. The vessel was used as a gambling boat, predominantly moored to a pier, which was partially related to the fact that the lake on which the vessel was located (Lake Michigan) was rough for much of the year. *Harkins v. Riverboat Services, Inc.*, 385 F. 3d at 1100. When the vessel did sail, it was for short distances. *Id*. The vessels were inspected by the USCG and carried COIs mandating a specified type and number of marine crew employees who were required to be aboard the vessel. *Tate v. Showboat Marina Casino Partnership*, 357 F. Supp. 2d at 1077. The plaintiffs in the *Harkins* and *Tate* cases were members of the USCG mandated marine crew (*Tate v. Showboat Marina Casino Partnership*, 357 F. Supp. 2d at 1076; *Tate v.*

*Showboat Marina Casino Partnership*, 431 F. 3d at 581-582) and, as such, were "responsible for the operation of the ship or (as comprehended within that term) the safety of the ship's passengers." *Harkins v. Riverboat Services, Inc.*, 385 F. 3d at 1100.

Both *Harkins* and to a greater extent, *Tate*, analyzed the work carried out by the plaintiffs in terms of whether it constituted maritime functions insuring the safe operations of the vessel and the welfare of its passengers and crew (albeit in the context of determining whether plaintiffs rebutted the presumption that they were not seamen). In *Harkins*, the court commented upon the jury findings that the plaintiffs performed housekeeping work such as keeping the ship afloat and clean, scraping barnacles off its hull, keeping the engines in repair and preventing fires, and held that this work was maritime work. *Harkins v. Riverboat Services, Inc.*, 385 F. 3d at 1104; *Tate v. Showboat Marina Casino Partnership*, 357 F. Supp. 2d at 1085. In *Tate*, the court analyzed the plaintiffs' allegedly non-maritime services. It held that the plaintiffs' duties consisting of (i) standing on shore watching the ramp way over which passengers boarded the vessel to monitor passengers' safety, even though being required at the same time to "greet" passengers, performed functions directly related to a seaman's primary maritime function and (ii) performing general cleaning and maintenance duties on board the vessel, described as including cleaning up or removing garbage, cleaning out ashtrays, cleaning up spills, vacuuming carpet and vents, cleaning windows, and replacing ceiling tiles intended to maintain the safety of the ship, were related to the safe and efficient operation of the vessel, and therefore the duties of a seaman. As such, the court concluded that the plaintiffs, who were COI mandated crewmembers, were exempt seamen under the FLSA. *Tate v. Showboat Marina Casino Partnership*, 357 F. Supp. 2d at 1082-85.

**B.      Applicable Federal Statutes and Regulations Also Support the Plaintiffs' Exempt Status**

The two separate, but compatible, statutory schemes applicable here[9] also compel the conclusion, as a matter of law, that the plaintiffs are exempt seamen.

BHC's vessels are subject to well and long-established[10] statutory and regulatory authority applicable to seamen and enforced by the USCG.[11]  This includes the inspection of small passenger vessels by the USCG and the issuance to each inspected vessel of a COI.  This process includes the determination by the USCG of the "minimum" complement of licensed individuals (e.g. licensed captains) and licensed or unlicensed crew, deemed "necessary" *for the safe operation of the vessel.  46 U.S.C. § 8101(a); 46 CFR § 15.101.*  (Emphasis added).

The USCG, in undertaking its inspection of the vessel and mandates with respect to the several matters addressed in, and issuing, the COI, gives consideration to, among other things, emergency situations, the size and type of the vessel, its installed equipment, the proposed routes of operation, the type of service in which the vessel is employed, the degree of its automation, use of labor saving devices, and its organizational structure.  *46 CFR § 15.501(b).*  Upon issuance of the mandate as to crew, set forth in the COI, the vessel may not be operated unless it has in its service and on board, the complement of crew, by type and number, required by the

---

[9] BHC's vessels and its crew are governed by and must comply with the statutes at *46 U.S.C. § 8101, et seq.* and the implementing regulations at *46 C.F.R. § 15.501, et seq.*, relative to the USCG's determination of minimum crew and crew responsibilities and duties.  BHC's crew members are exempt from the overtime provisions of the FLSA by the statute at *29 U.S.C. §213(b)(6)* and the implementing regulations at *29 C.F.R. § 783.29, et seq.*

[10] In reorganizing title 46 of the United States Code, Congress expressed that the maritime laws administered by the USCG are "some of the oldest" of federal maritime laws, many of which were codified in 1874.  House Report (Merchant Marine and Fisheries Committee) No. 998-338, Aug. 1, 1983, reprinted in 6A U.S. Code Cong. & Admin. News 925 (Oct. 1983).  Those regarding the manning of *small passenger vessels*, the expressed intention of which is the protection of passengers and crew, were derived from an 1871 Act.  *Crook v. Allen*, 778 F. 2d 1037, 1041-42 n. 6 (5th Cir. 1985).

[11] Indeed, the applicable statutes (*46 U.S.C. § 8101, et seq)* and regulations (*46 C.F.R. § 15.501, et seq)*, relative to the USCG's inspection of vessels and determination of minimum complement of crew, are entitled "Vessels and Seamen."

COI.  *46 CFR § 15.515(a)*.  The vessel's master (which in the case of BHC's vessels is the licensed captain) is responsible to ensure the proper manning of his vessel in accordance with applicable laws, regulations and the COI.  *46 CFR § 15.801*.  Whenever a vessel is deprived of the service of a member of its mandated complement of crew, and the master is unable to find appropriate credentialed personnel to man the vessel, the master may proceed, but only after first having determined that the vessel is sufficiently manned and only where a report of "sailing short" is filed in writing with the USCG's Officer in Charge, Marine Inspection.  The report must explain the cause of each deficiency and must be submitted within 12 hours after arrival at the vessel's next port and a master's failure to submit the required report can result in the assessment of a civil penalty.  *46 CFR § 15.725*.

The statutory directive is clear—"[a] vessel to which [the statute] applies may not be operated[12] without having in its service the complement required."  *46 U.S.C. § 8101(d)*.  Simply, without her required complement of crew, no BHC vessel can operate as a means of transportation.  Consequently, the vessels' crew, which includes the plaintiffs, are clearly seamen under the FLSA.  See, *Godard v. Alabama Pilot, Inc.*, 485 F. Supp. 2d at 1298 (court held that launch operators of *uninspected* pilot boats who acted as both captain and crew, which boats could not be operated as a means of transportation without them, were seamen under the FLSA).

---

[12] The predecessor to this statute, *46 U.S.C. §222*, provided that no vessel subject to the inspection provisions of the statutes "shall be navigated" without having the complement of licensed officers and crew as may in the judgment of the USCG be necessary for "her safe navigation" (cited and quoted in *Crook v. Allen*, 778 F. 2d at 1041-42 n. 6). This exact same language, appearing in *52 U.S.C. §4463*, governing the mandatory complement of crew aboard passenger steamers, was (cited and) interpreted in *United States of America v. Steamtug Union*, 1932 AMC 1331,\*1332-33 (S.D.N.Y. 1914). Considering the purpose of the statutory language, being to ensure "safety in navigation," the court held that the navigation of a vessel covers the time when the vessel is engaged in its business, which is not limited only to its movement through the water, but instead includes time spent moored to a wharf awaiting orders and time spent taking on water, fuel and stores. *Id.* at 1336-37. The substitution in the current statutory language of the word "operation," for "navigation," plainly encompasses those tasks necessary to the operation of inspected small passenger vessels including fueling, the taking on of supplies, and most certainly all tasks related to the safe boarding, transporting and disembarking, of the passengers, which constitute the very reason such vessels are operated.

The FLSA's regulations support this conclusion.  The FLSA[13] does not define the term "seaman;" however, the Department of Labor ("DOL") has promulgated regulations explaining that an employee will be regarded as a seaman for FLSA purposes "if he performs, as master or subject to the authority, direction, and control of the master aboard a vessel, service which is rendered primarily as an aid in the operation of such vessel as a means of transportation, provided he performs no substantial amount of work of a different character." *29 C.F.R. §783.31.*  The regulations further state that an employee's eligibility for the seaman exemption "depends upon the character of the work he actually performs and not on what it is called or the place where it is performed." *29 C.F.R. §783.33.*  Consequently, a concessionaire, dredging employee, or stevedore is not FLSA-exempt as a seaman *simply* because he happens to perform such duties aboard a vessel, inasmuch as such services *generally* are not rendered primarily as an aid to operation of the vessel as a means of transportation.  See *29 C.F.R. §§783.33-34.*

In contrast, members of the vessel's crew, including "sailors, engineers, radio operators, firemen, pursers, surgeons, cooks, and stewards" are seamen, if, *as is the usual case*, their services are rendered primarily as an aid in the operation of the vessel as a means of transportation.  *29 C.F.R. §783.32* (Emphasis added).  The seaman inquiry is whether "one's services are rendered primarily as an aid in the operation of the vessel as a means of transportation, *as for example* services performed substantially as an aid to the vessel in navigation."[14]  See *29 C.F.R. §783.33.*  (Emphasis added).

---

[13] The FLSA requires employers employing a non-exempt employee for a workweek exceeding 40 hours to provide compensation for all hours in excess of 40 in any workweek at a rate of not less than one and one half times the employee's regular rate.  *29 U.S.C. §207(a)(1).*  The FLSA contains a specific statutory exemption which excludes from the ambit of the overtime requirement "any employee employed as a seaman" aboard a vessel.  *29 U.S.C. §213(b)(6); 29 C.F.R. §§783.29(c),783.31.*

[14] The DOL interpretive regulations specifically make clear that a worker does not have to be actively navigating the vessel for his work to qualify as seaman work.  To the contrary, a variety of ancillary, support functions constitute

The COI mandated crew members aboard BHC's vessels are seamen.  They, solely, are responsible for the safe operation of the vessel and the safety of her passengers.  This responsibility is imposed by federal law, and carried out by the crew.  If the crew are not on board, the vessel may not be operated and carry or transport her passengers.  Consequently, their mere presence aboard is essential to the operation of the vessel as a means of transportation.  Simply, without them, the vessel does not operate.  As such, the plaintiffs are exempt seamen.

### C.        Plaintiffs' Duties Qualify as Seaman Duties

In addition to the fact that their physical presence aboard is absolutely necessary in order that the vessel be operated as a means of transporting passengers, the duties undertaken by BHC's deckhands plainly qualify as maritime duties and indeed are rendered primarily as an aid in the vessel's operation as a means of transporting her passengers.

Named representative  plaintiff Chris McLaughlin testified that he:

1.        Was subject to the authority and control of the captain;
2.        Handled lines;
3.        Assisted in docking and mooring the vessel;

---

seaman work (e.g., engineers, radio operators, cooks, stewards, and pursers (defined in the Merriam-Webster dictionary as "an official on a ship responsible for papers and accounts and on a passenger ship also for the comfort and welfare of  passengers")).  To clarify, the regulations offer the example of a crewmember serving as a watchman of a vessel during a temporary stay in port or during a brief lay-up for minor repairs.  According to the regulation, that watchman function is a seaman duty, as is the function of having licensed relief engineers maintain the ship in safe and operational condition.  *29 C.F.R. §783.35.*  Simply, the regulation does not limit exempt status to seamen who undertake navigational responsibilities of any particular complexity, or at all.  See, *Martin v. McAllister Lighterage Line,* 205 F. 2d 620, 625 (2d Cir. 1953).  In considering the issue of whether a worker was a member of the crew, which had been held to include those who are "'naturally and primarily on board' the vessel 'to aid in her navigation,'" the United States Supreme Court held that navigation was not limited to "putting over the helm."  Instead, the Court held that duties contemplated by the "aid in navigation" language embraced those essential for "other purposes of the vessel" and crew members included all those who contributed to the labors about the operation and welfare of the ship when on the voyage.  *Norton v. Warner Co*., 321 U.S. 565, 571-72 (1944).  As the First Circuit stated, "[t]he requirement that a ship be in navigation; that there be a more or less permanent connection with the ship; and that the worker be aboard primarily to aid in navigation appear to us to be the essential and decisive elements of the definition of a 'member of a crew'.  It is important to note that one is aiding in navigation even though he happens to be a cook or an engineer.  The whole ship's company is aiding in navigation."  *Carumbo v. Cape Cod S.S. Co.*, 123 F. 2d 991, 995 (1st Cir. 1941) (cases cited therein omitted).  Significantly, although *Carumbo* was decided under a different statutory scheme, the identities of the types of crew members are substantially similar to those crew members expressly included as seamen under the FLSA regulation, and the manner in which *Carumbo* viewed crew members' duties as being in aid of navigation, applies to the same language appearing in the FLSA regulation at 29 C.F.R. §783.33.

4. Made passenger safety announcements;

5. Handled and secured gangways over which passengers embarked and disembarked;

6. Conducted vessel inspections;

7. Assisted passengers in boarding and disembarking;

8. Conducted passenger head counts including by taking passenger tickets;

9. Reported passenger headcounts to the captain;

10. Was responsible for insuring passenger safety;

11. Assisted passengers by directing them about the vessel, answering questions, and keeping an eye on children during whale watches;

12. Occasionally relieved the captain and steered the vessel;

13. Assisted the captain in watching for buoys or hazards and watching for objects in the water that had appeared on the vessel's radar;

14. Assisted the captain by monitoring the vessel's GPS in the event of heavy snow or fog;

15. Occasionally docked the vessel;

16. Regularly assisted the captain with the inspection and maintenance of the vessel; including conducting brief engine room checks to look for coolant leaks or exhaust leaks;

17. As ordered by the captain, conducted engine room checks when a vessel's gauges went awry;

18. Accompanied and assisted the captain in checking the engine's oil and hydraulic fluids;

19. Assisted in fueling the vessels including attaching the fuel hose;

20. Cleaned the vessel which included cleaning seaweed and debris from the vessel's water intake strainer;

21. Cleaned snow from the vessel's radar equipment;

22. Cleaned the vessel's heads and removed trash from the vessel;

23. Washed down the outside of the vessel, including washing the vessel's windows to remove salt;

24. Conducted training of newly hired deckhands including demonstrating how to throw lines, safely handle the gangway, and clean the vessel;

25. Participated in emergency response training including man overboard and fire drills, and safety inspections;

26. Became familiar with the location of life jackets and personal flotation devices and was responsible for instructing passengers in the event that such equipment was required to be used;

27. Became familiar with the operation of the life rafts and the fire extinguishers; the fire axes, the emergency fuel shutoff, and the first aid kit;

28. Ensured that the lights where passengers boarded were operational and either reported outages to the captain or changed the light bulbs;

29. After 9/11, being instructed to be on heightened alert and specifically to inspect the vessel for bags and backpacks left behind by passengers; carried out extra safety precautions by looking under seats while cleaning the vessel; and reporting any discovered items;

30. Gathered stock and loaded it onto the vessel;

31. A few times a week, assisted in the galley by starting the coffee, which took about one-half hour of time;

32. Became familiar with materials on board relative to emergency procedures (known as the Station Bill); and

33. Performed *all* of the deckhand duties as described in BHC's Crew Member Orientation and Training Manual, *except for* conducting daily inspections of fire-fighting equipment, ensuring the use of personal protective equipment and clothing, assigning vessel maintenance projects, painting the vessel, and performing security patrols.

**Ex. G, McLaughlin Depo. pp. 36, 38, 40, 44-46, 49-50, 53, 55-58, 64-65, 66-67, 71-74, 76-85, 86 and Errata Sheet, 89, 90-91 and Errata Sheet, 92, 94-97, Errata Sheet.**

Named representative plaintiff Sandra McGrath (who alleges she was a galley staff employee) testified that she:

1. Was subject to the authority and control of the captain;

2. Assisted with the gangway to allow passengers to safely board and disembark from the vessel;

3. Assisted in line handling;

4. Stood watch in the wheelhouse;

5. Reported passenger headcounts to the captain;

7. Performed the task of hooking up shore power for the vessel;

8. Became familiar with the location of the vessel's fire hose and shut off valves; and was assigned to hold open the doors of the vessel in the event of an emergency;

9. Became familiar with the location of the vessel's life rafts, life preservers, emergency beacons, and fire extinguishers;

10. Participated in emergency response training including fire evacuation, man overboard and fire drills, and safety inspections;

11. Participated in USCG inspections which included taking apart the life jackets, counting them, and returning them to be stored;

12. Conducted emergency announcements;

13. Assisted passengers by directing them about the vessel and answering questions;

14. Kept watch over passengers and reported issues to the captain or other crew; directed other crew to carry out passenger safety tasks;

15. Was responsible for insuring passenger safety; including being responsible for responding to and assisting passengers in the event of emergencies, including by directing passengers to appropriate exits and assisting them off the vessel;

16. Responded to passenger medical emergencies, including providing first aid, comfort and assistance; made passenger announcements;

17. Responded to vessel collision by undertaking emergency response actions including lowering the Jacob's ladder, obtaining life preservers and throwing life rings to individuals in the water; inspecting the vessel for damages; inspecting

vessel hatches to determine whether there was water leakage; handling the lines of the vessel that arrived to provide assistance;

18.    Cleaned the vessel;
19.    Removed trash from the vessel;
20.    Checked the vessel's interior lighting;
21.    Counted the vessel's life preservers;
22.    Sold food and beverages from the galley;
23.    Loaded supplies and stores onto the vessel; and
24.    Became familiar with materials on board relative to emergency procedures (known as the Station Bill).

**Ex. E, McGrath Depo. pp. 22, 31, 39-41, 58-60, 62, 64-66, 69-70, 77-80, 84-87, 97 and Errata Sheet, 99, 115, Errata Sheet; Ex. F, McGrath Ans. to Ints. Nos. 5, 11, 18, 19.**

BHC's deckhands (including named representative plaintiffs McLaughlin and McGrath) perform their duties and responsibilities almost exclusively on the vessel.[15] **Ex. A, Nolan Affid. ¶16; Ex. E, McGrath Depo. p. 91; Ex. G, McLaughlin Depo. pp. 36, 49-50.**

Such duties were carried out to insure safe vessel operations, passenger safety and passenger comfort, and constitute seaman duties. **Ex. B, Coates Report, p. 5; Exhibit C, DuBois Report, p. 12; Ex. D, Burpee Report, p. 4**. Significantly, the duties carried out by named representative plaintiff Sandra McGrath in the vessel's galley, are specifically permitted by the USCG and, therefore, her status as a member of the crew, whose presence is legally necessary in order that the vessel be operated and her passengers transported, is not impacted. In NVIC[16] Number 1-91, the USCG addresses recommended qualifications for small passenger vessel deckhands. Its stated purpose is to provide the marine industry with guidelines for the

---

[15] Occasionally, deckhands shovel snow from the gangways used by the passengers to board and disembark the vessels, as well as the dock areas on land surrounding where passengers board and disembark the vessels. **Ex. A, Nolan Affid. ¶16; Ex. G, McLaughlin Depo. p. 73.**

[16] The USCG issues NVICs in order to provide detailed guidance about the enforcement or compliance with certain federal marine safety regulations and Coast Guard Marine safety programs. While NVICs are nondirective, meaning that they do not have the force of law, they are important "tools" for complying with the law. NVICs are used internally by USCG to insure that inspections and other regulatory actions conducted by its field personnel are adequate, complete and consistent. Likewise, the marine industry uses NVICs as a means of determining how the USCG will be enforcing certain regulations or conducting various marine safety programs. **Ex. A, Nolan Affid. ¶9, Ex. 3**.

recommended qualifications and training topics the deckhands engaged or employed on small passenger vessels "to insure the safe operation of these vessels."  Consistent with its stated purpose, the USCG provides that some or all of a small passenger vessel's deckhands may be permitted to perform duties such as concessionaires, waiters or waitresses "provided that they can readily respond to their regularly assigned deckhand duties."  **Ex. A, Nolan Affid. ¶9, Ex. 3**.

BHC's deckhands assigned to the galley do not act as concessionaires, waiters or waitresses.  Their galley duties are limited to the sale of pre-packaged or pre-prepared food (e.g., donuts, muffins, bags of potato chips and peanuts and pre-made and pre-packaged sandwiches, soft drinks in cans, juice in cartons, wine in single size containers and beer in cans).  In this regard, the individual hands over the selected item and collects the money.  They do not prepare or cook food.  The galley is located, on each of BHC's vessels, on the main passenger deck and is constructed of an approximately 38 inch three sided partition with a counter behind which the deckhand stands.  Being located on the main passenger deck, where typically the greatest number of passengers sit, the deckhand working the galley is in a particularly well-suited position to observe and oversee the safety of the passengers.  In no way is the deckhand working in the galley relieved of and, more importantly, prevented from performing his/her passenger safety related duties and functions.  Deckhands working in the galley have responsibility for specific emergency response actions, in accordance with USCG requirements, BHC's Crew Orientation and Training Manual, as well as each vessel's Station Bill.

As demonstrated, the plaintiffs performed maritime functions aboard the vessels to which they were assigned, which were rendered primarily as an aid to the operation of the vessel and the safe transportation of her passengers.  As such, the plaintiffs are exempt seamen.

**D.     The Legislative History of the Seaman Exemption Also Supports
the Plaintiffs' Exempt Status**

The legislative history of the seaman exemption also supports the inclusion of the

plaintiffs as exempt employees.  As detailed in cases from this district and the First Circuit, the

seaman exemption came about as a result of the request by representatives of the chief labor

organizations representing seaman, The National Maritime Union of America and Sailors' Union

of Pacific.  *Bolan v. Bay State Dredging and Contracting Co.*, 48 F. Supp. at 268-269; *Walling v.*

*Bay State Dredging and Contracting Co.*, 149 F. 2d 346, 349-50 (1st Cir. 1945), cert. denied,

326 U.S. 760 (1945).   Representatives of these unions appeared before the joint legislative

committee on the bill and made a plea for the exemption of seamen from the FLSA (enacted in

1938) on the ground that their interests had already been protected by other legislation-- referring

to the Merchant Marine Act of 1936, 46 U.S.C. §1101 et seq.-- suggesting that without some

exception being made the bill would interfere with prior legislation.  *Bolan v. Bay State*

*Dredging and Contracting Co.*, 48 F. Supp. at 268-269; *Walling v. Bay State Dredging and*

*Contracting Co.*, 149 F. 2d at 349-50.  The representatives of the unions made clear, by what

they said, what they meant by "seamen."

> As this newly formed Maritime Commission has jurisdiction at present over seamen in
> regard to wages, working conditions, and manning scales on subsidized merchant ships,
> and as we have every faith in the ability and competency of the Commission to handle
> our affairs, we feel that for the present time that that jurisdiction should not be hampered
> or impaired by any legislation that would be conflicting.

*Walling v. Bay State Dredging and Contracting Co.*, 149 F. 2d at 349.

The colloquy between the union witness and Senator Black, Chairman of the Committee

(later Supreme Court Justice Black), demonstrates that they agreed upon the expediency of the

amendment and upon the reason.  *Id*. at 350.  In the hearing both the witness and the member of

the committee used the term "seamen" with its common meaning.  *Id*.  Specifically, in explaining

the exemption, Senator Black stated that "it was the policy of the committee, in cases where regulation of hours and wages are given to other governmental agencies, to write the bill in such a way as not to conflict with such regulation.  That action was taken with reference to maritime workers." *Bolan v. Bay State Dredging and Contracting Co.*, 48 F. Supp. at 269, quoting *Cong. Rec. Vol. 81, p. 7875*.

That there does not seem to be much doubt that the "seamen" who requested and were granted exemption from the provisions of the FLSA were "members of the crew," who are "seamen in the true sense," is bolstered by the fact that the same unions who requested exclusion from the provisions of the FLSA on a behalf of "seamen," also requested and received exclusion for "seamen" under the Longshoremen's and Harbor Worker's Compensation Act ("Longshoremen's Act") (enacted in 1927).  *Bolan v. Bay State Dredging and Contracting Co.*, 48 F. Supp. at 268-69.  Significantly, excluded from the benefits of the Longshoremen's Act is "a master or member of a crew of any vessel." *33 U.S.C. § 902 (3)(G).*  As a result, there is little difficulty in construing "seaman" as used by Congress in the FLSA seaman exemption as having its "plain and ordinary meaning-- members of the crew-- unless the context in which it appears indicates otherwise." *Id.* at 269.  "[W]ithout question,[  ] the type of workers [Senator] Black referred to, and which were to be exempt, were "seamen" who were "members of the crew." *Id.*

The holding in *Bolan* that the term "seaman" under the FLSA includes "members of the crew," *as are the plaintiffs*, is supported by long held precedent in the First Circuit.  In *Carumbo*, the First Circuit expressed the view that "the word 'seaman' under the Jones Act [did] not mean the same thing as 'member of a crew' under the Longshoremen's Act." *Id.* at 994.  It concluded that "one who does any sort of work aboard a ship in navigation is a 'seaman' within the meaning of the Jones Act." *Id.* at 995.  To the phrase "member of a crew," on the other hand, the

31

court gave a more "restrictive" meaning. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 364, 115 S. Ct. 2172 (1995). The court adopted three elements to define the phrase, holding that "the requirements that the ship be in navigation; that there be a more or less permanent connection with the ship; and that the worker be aboard primarily to aid in navigation appear to us to be the essential and decisive elements of the definition of a 'member of a crew.'" *Id.* at 995.

In further refining its meaning, the court stated that "[i]t is most important to note that one is aiding in navigation even though he happens to be a cook or an engineer. The whole ship's company [i.e. its crew], is aiding in navigation." *Id.* at 995. In determining the meaning of the phrase, as it did, the court found "helpful" language in a Fifth Circuit of Appeals case, *Maryland Casualty Co. v. Lawson*, 94 F. 2d 190, 192 (5th Cir. 1938), discussing that a member of the crew is one who has an obligation to promote the vessel's enterprise and to protect her in an emergency. *Id*. at 995 n. 2. If she has a master, the crew member is subject to his commands. *Id.* Engineers and cooks, as well as sailors, are included, while longshoremen who load and unload a vessel do not become members of the crew, nor do mechanics who similarly come aboard her to repair or clean or paint her, but at the same time, those who are employed as members of the crew, do not cease to be members of the crew because they perform the same sort of work (e.g., repairing, cleaning or painting). *Id*.

With the benefit of the legislative history and the First Circuit's analysis and holding in *Carumbo*, the *Bolan* court held that the FLSA's exemption for a "seaman" covered the plaintiff, who was employed as a deckhand on a dredge, and was a member the crew. If, as the FLSA regulations provide, the seaman exemption was intended to exempt employees employed as seamen in the "ordinary meaning of that word," referring specifically to the same legislative history relied upon by the *Bolan* court, the plaintiffs, who are members of the crew as mandated

32

by the USCG, without whose presence on board the vessel may not operate and transport her passengers, and who along with the captain are solely responsible for the operation of the vessel and the safe transportation of her passengers, are covered by the exemption.

The plaintiffs here are, indeed, members of the crew as mandated by the USCG. Consequently, they are seamen and covered by the exemption.

## CONCLUSION

Based upon the undisputed facts, and the law, BHC respectfully requests that the court enter summary judgment in its favor.

Respectfully submitted,

**HARBOR CRUISES LLC,**
**NOLAN ASSOCIATES LLC AND**
**FREDERICK L. NOLAN, III**

By their attorneys,

**/s/ Mary E. O'Neal**
MARY E. O'NEAL--BBO # 379325
PATRICIA A. GRANGER--BBO# 565993
**MASTERMAN, CULBERT & TULLY LLP**
One Lewis Wharf
Boston, Massachusetts 02110
(617) 722-8100

Dated:  March 26, 2010

## CERTIFICATE OF SERVICE

I, Mary E. O'Neal, Attorney for Defendants, hereby certify that the foregoing Defendant's Memorandum of Law in Support of Defendants' Motion for Summary Judgment, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of the Electronic Filing.

**/s/ Mary E. O'Neal**
MARY E. O'NEAL

Dated:  March 26, 2010

MCT/244760.1