UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

_____ )
CHRIS McLAUGHLIN and                    )
SANDRA McGRATH,                         )
Individually and on Behalf of           )
All Other Persons Similarly Situated,   )
    Plaintiffs                          )         CIVIL ACTION NO.
                                        )         NO. 06-CA-11299-GAO
v.                                      )
                                        )
HARBOR CRUISES LLC,                     )
NOLAN ASSOCIATES LLC                    )
(both d/b/a "Boston Harbor Cruises") and )
FREDERICK L. NOLAN, III,                )
    Defendants                          )
_____ )

**DEFENDANTS' RESPONSE TO PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**A.**    **DOL Regulations Comport With USCG Regulations In The Definition Of
"Seaman" Relative To Vessels Such As BHC's Vessels**

The term "seaman" has been used and defined under numerous federal statutes prior to

the enactment of the FLSA and the issuance by the U.S. Department of Labor ("DOL") of its

interpretory regulations.  Had Congress intended to rewrite the definition of such term and alter

the protections and benefits afforded to "seamen" under long existing statutory schemes, it would

have done so clearly and explicitly.  The FLSA itself merely exempts from its overtime

requirements an employee who is "employed as a seaman."  *29 U.S.C. §213(b)(6).*  "[I]n

interpreting a statute a court should always turn to one cardinal canon before all others. . .

[C]ourts must presume that a legislature says in a statute what it means and means in a statute

what it says there."  *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-254 (1992).  Indeed,

"[w]hen the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"  *Id.* at 254 (*quoting Rubin v. United States*, 449 U.S. 424, 430 (1981)). Unless there is a "positive repugnancy" between two statutes, "a court must give effect to both." *Id.* at 253 (internal citation omitted).

If a statute administered by an agency is silent or ambiguous with respect to the specific issue, the court must determine if the agency's interpretation is based upon a permissible construction of the statute.  *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984).  The DOL, in promulgating regulations to interpret the term "seaman" relied upon long-standing case law[1] and expressly acknowledged that for the purposes of the FLSA exemption, the term "seaman" is intended to have its "ordinary meaning."  *29 C.F.R. §783.29(b)* (internal citations omitted).  In fact, the regulation at *29 C.F.R. §783.30*, in reference to the 1961 amendment to the FLSA and the fact of the retention in the 1961 amendment of the basic language of the original exemption, "employee employed as a seaman," provides that "the legislative history and prior judicial construction (see §783.29) of the scope and meaning of this phrase *would seem controlling* for purposes of the amended Act."  *Emphasis added*. Significantly as well, the regulation at *29 C.F.R. §783.4,* addressing supportive judicial interpretations of the FLSA's seaman exemption, specifies that

> [t]he ultimate decisions on interpretations of the Act *are made by the courts* (Mitchell v. Zachry, 362 U.S. 310; Kirschbaum v. Walling, 316 U.S. 517).  Court

---

[1] Plaintiffs note that BHC relied upon pre-regulation cases (**Opposition Brief, p. 13, n.12**) and then incorrectly assert that BHC's reliance is misplaced because the cases pre-date the regulations.  However, the DOL regulations themselves cite to, and incorporate, *numerous* pre-regulation cases, including the *Walling v. Keansburg Steamboat* case cited and relied upon by BHC, referring to several pre-regulation cases as being "authoritative" (*29 C.F.R. §783.31*, specifically referring to the cases cited in 29 C.F.R. §§783.28 and 783.29), in the context of discussing the legislative history and cases decided under the FLSA's seaman exemption prior to the adoption of the regulations.

Instead of the cases being of "no persuasive value," as plaintiffs assert (**Opposition Brief, p. 13, n.12**), they are of significant import as they were the courts' determinations of the meaning and intent of the FLSA's seaman exemption, in effect for years (i.e., since 1938) before the regulations were promulgated in 1962 and were, in several instances, expressly adopted in the regulations.

decisions supporting interpretations contained in this part are cited where it is believed they may be helpful.  On matters which have not been determined by the courts, it is necessary for the Secretary of Labor and the Administrator to reach conclusions as to the meaning and the application of provisions of the law in order to carry out their responsibilities of administration and enforcement  (Skidmore v. Swift, 323 U.S. 134).  In order that these positions may be made known to persons who may be affected by them, official interpretations are issued by the Administrator on the advice of the Solicitor of Labor, as authorized by the Secretary (reorg. Pl. 6 of 1950, 64 Stat. 1263; Gen. Ord. 45A, May 24, 1950, 15 FR 3290).  As included in this part, these interpretations are believed to express the intent of the law as reflected in its provisions *and as construed by the courts and evidenced by its legislative history*.  References to pertinent legislative history are made in this part where it appears that they will contribute to a better understanding of the interpretations.

*Emphasis added.*

The regulations further acknowledge that the term "seaman" includes "members of the crew such as sailors, . . . cooks, and stewards if, as is the usual case, their service is of the type described in Section 783.31." *29 C.F.R. §783.32.*  Moreover, and consistent with the USCG regulations, the DOL regulations define those who are *not* seamen as those aboard "a vessel [who] ordinarily do not perform their services subject to the authority, direction, and control of the master of the vessel, except incidentally, and their services are ordinarily not rendered primarily as an aid in the operation of the vessel as a means of transportation." *29 C.F.R. §783.34.*

BHC has established, and plaintiffs admit, that pursuant to USCG regulations, and specifically each vessel's COI, the deckhands (including galley staff) are members of the crew, i.e. seamen, who are necessary and required to be on BHC's vessels for their operation and the transportation of their passengers, and perform their services subject to the authority, direction, and control of the master of the vessel (i.e. the captain).  The undisputed facts establish that the primary purpose for the employment of BHC's deckhands are to meet USCG regulations and requirements in the safe operation of the vessel and the transportation of her passengers, and that

MCT/248033.1

the deckhands perform no duties onshore beyond those involved with the safe boarding and disembarking of passengers.  Simply, consistent with both USCG and DOL regulations, BHC's deckhands are "seaman" under the FLSA as a matter of law.

**B.     Assuming *Arguendo* That 29 C.F.R. §783.37 Is Applicable To BHC Deckhands Despite Their Classification As "Seamen" Under USCG Regulations, These Employees (Inclusive of Galley Staff) Meet The FLSA Regulatory Definition Of "Seaman" As They Do Not Perform A "Substantial Amount Of Work Of A Different Character"**

Plaintiffs argue that summary judgment is inappropriate because the percentage of working time deckhands spend on various tasks is disputed.  Specifically, plaintiffs argue that DOL regulations require BHC to prove that a deckhand "spends at least 80% of his time on tasks rendered in aid of the navigation of the vessel" in order to be exempt.  **Opposition Brief, pp. 12-13**.  This argument does not comport with the express language of 29 C.F.R. §783.31 or 29 C.F.R. §783.37 and is a mischaracterization of the "over 20% rule" and its interpretation by the DOL and the courts.

Plaintiffs do not dispute that the deckhands (inclusive of the galley staff) "perform service which is rendered primarily as an aid in the operation of such vessel as a means of transportation." *29 C.F.R. §783.31*.  Rather, they argue that the exemption is destroyed because deckhands also perform a "substantial amount of *work of a different character*." *29 C.F.R. §783.37* (*emphasis added*).  To aid in the interpretation of this regulation, and as acknowledged by plaintiffs (**Opposition Brief, p. 12**) the DOL has defined work that is "substantial" to mean work that is "more than 20%" of the time worked by the employee during the workweek. *29 C.F.R. §783.37.*[2]  From this regulation, plaintiffs then make a quantum leap, arguing that BHC

---

[2] In its entirety, *Section 783.37* provides that:

> In the enforcement of the Act, an employee will be regarded as "employed as a seaman" if his work as a whole meets the test stated in Section 783.31, even though during the workweek he performs some work of a nature other than that which characterizes the service of a seaman, if

must demonstrate that deckhands spend "at least 80% of [their] time on tasks rendered in aid of the *navigation* of the vessel." **Opposition Brief, pp. 12-13** (emphasis added).

Contrary to plaintiffs' argument, the regulation does not require that exempt employees perform at a greater than 80% level,[3] which is the import of plaintiffs' argument, nor does the regulation defining a seaman require that the exempt work be in the nature of navigational duties, as plaintiffs continually assert.  Instead, the regulation (at *29 C.F.R. §783.37*) addressing under what circumstances an exempt employee's seaman status may be undermined, focuses on *work* performed of a different character, i.e. that which is *not* rendered primarily as an aid in the operation of such vessel as a means of transportation.

Plaintiffs argue that material facts remain in dispute regarding the percentage of time spent by deckhands on their tasks.  However, the evidence relied upon by plaintiffs which assertedly contradicts BHC's evidence is based solely upon sample observations of plaintiffs' expert witness's "research assistant" and the interpretation of his research assistant's observations by the expert (Robert G. Radwin, Ph.D. ("Radwin")).  Specifically, plaintiffs assert that BHC "[d]eckhands and [g]alley [w]orkers spent an average of only 45% of their time engaged in activities related to seaman duties" and "deckhands and galley workers spend an average of 41% of their time performing non-work related activities (e.g., sitting, sleeping, reading a newspaper or a book, socializing with other employees, and eating and drinking),"[4]

---

such nonseaman's work is not substantial in amount.  For enforcement purposes, the Administrator's position is that such differing work is "substantial" if it occupies more than 20 percent of the time worked by the employee during the workweek.

[3] If the DOL regulation were intended to insure that employers received the benefit of 80% output from employees in order that the exemption apply, likely it would apply to no one.  The FLSA is not a "no loafing" statutory scheme.

[4] Plaintiffs' expert, Radwin, opines that deckhands spent 55% of their time performing tasks related to the navigation of the vessel (plus 41% of idle time), totaling 96% of their time, while the galley staff spent 7% of their time on duties related to the navigation of the vessel (plus 73% of idle time), totaling 80% of their time.  **Opposition Brief, p. 7.**

with the latter "*idle time*" being "the *largest* single component[5] of their time spent aboard ship." **Opposition Brief, pp. 6-7** (*emphasis added*).

Importantly, however, any dispute over how much idle time there is in a deckhand's workday does not create a dispute of a material fact. A material fact is one that would change the outcome in litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Plaintiffs' assertion that a portion (even a large portion) of the deckhand and galley worker time is idle time or waiting time does not destroy the exemption as such time does not constitute "work of a different character." Idle time, while awaiting an order from the captain, or riding on the vessel after it has left the dock, or waiting for the vessel to dock, or an emergency to arise is indisputably "service" that is essential to comply with USCG regulations as an aid in the operation of the vessel as a means of transportation. Simply, plaintiffs' argument that "idle time" is not related to the employees' seamen duties has no support in law, regulation or reality.

The FLSA and its regulations acknowledge that non-work activities, such as waiting time, can be a required, even an essential component, of the employee's position. *29 C.F.R. §785.15* (when an employee is unable to use the time effectively for his own purposes, it "belongs to and is controlled by the employer" and in all such cases, "waiting is an integral part of the job. The employee is engaged to wait."). See generally, *Skidmore v. Swift & Co.*, 323 U.S. 134, 136-137 (1944). In *Skidmore*, 323 U.S. at 136-137, the Court stated that "hours worked" under the FLSA is not limited to active labor: "[N]o principle of law found either in the statute or in Court decisions precludes waiting time from also being working time" and "[f]acts may show that the employee was engaged to wait[.]" *Accord Owens v. ITT Rayoinier, Inc.*, 971 F.2d 347, 350-51 (9th Cir. 1992). In *Armour & Co. v. Wantock,* 323 U.S. 126, 132 (1944), the Court further reiterated its interpretation of "work" in *Tennessee Coal, Iron & R.R. Co. v.*

---

[5] The absolute inaccuracy of this assertion is addressed, *supra*, at Section C, part 2.

*Muscoda Local No. 123*, 321 U.S. 590, 598 (1944) – *as meaning physical or mental exertion* (whether burdensome or not) that is controlled or required by the employer and is pursued necessarily and primarily for the benefit of the employer and his business." (emphasis supplied by the *Armour* Court).

Indeed, certain positions, e.g. seamen, firefighters, EMTs, etc., by their very nature, will involve "waiting or idle time" as part of their position duties.[6]   As courts have made abundantly clear,

> [A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen.  Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity.  Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer.

*Detling v. United States,* 432 F.2d 462, 465 (Ct. Cl. 1970) (*quoting Armour & Co. v. Wantock,* 323 U.S. at 133); *Id*. (In citing to and quoting from its earlier decision in *Missouri, Kansas & Texas Railway Co. v. United States,* 231 U.S. 112, 119 (1913), where the Court had held that certain employees "were none the less on duty when inactive" as "[t]heir duty was to stand and wait," the *Armour* Court held "[t]hat inactive duty may be duty nonetheless is not a new principle invented for application to th[e] [FLSA].")  See also, e.g. *Christian v. The City of Gladstone, Missouri,* 108 F.3d 929, 934 (8th Cir. 1997) (In the context of paramedics and their attempt to argue that the (more than) 20% non-exempt work limitation found in 20 C.F.R. §553.212(a) applied to their non-emergency tasks, the court held that such rule was inapplicable to time spent on related service, such as waiting for calls to which the paramedics would then

---

[6] By regulation, the DOL provides that a "stenographer who reads a book while waiting for dictation, a messenger who works a crossword puzzle while awaiting assignments, a fireman who plays checkers while waiting for alarms and a factory worker who talks to his fellow employees while waiting for machinery to be repaired are all working during their periods of inactivity" and as such "waiting is an integral part of the job." *29 C.F.R. §785.15.*  It is no different for BHC's deckhands.

respond, as such an activity did "not alter the nature of their duties or cause them to perform tasks unrelated to their job.").

Consequently, the fact that the deckhands may have waiting time or idle time while aboard the vessel does nothing to alter the fact that their very presence on the vessel, as mandated by the COI, is service rendered primarily in the aid of the operation of the vessel[7] and such time is work time, as well as readiness to serve and fulfill additional seaman functions (docking, responding to emergencies, tying up the vessel, assisting passengers, etc.).

Whether activities are "seaman" duties, as well as the ultimate question regarding whether an employee is exempt under the FLSA is an issue of law. *Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714 (1986); *Godard v. Alabama Pilot, Inc.*, 2007 U.S. Dist. LEXIS 31376 *6 (S.D. Ala). Here, the alleged dispute of material fact regarding the percentage of time is immaterial given that assuming, *arguendo*, plaintiffs' expert, Radwin, should be credited, the deckhands (inclusive of the galley staff) are exempt as "seamen" from the overtime provisions of the FLSA where, as here, no differing *work* occupies more than 20 percent of the time worked by the deckhands. Furthermore, the so-called idle time indeed constitutes work related to the deckhand's job, so that if plaintiffs are correct that BHC must demonstrate that the deckhands perform seaman work at least 80% of the time, even according to Radwin's report, BHC has done so.

---

[7] Alternatively, should plaintiffs attempt to revise their argument to suggest that such idle time does not constitute "waiting time," (i.e. work time) for purposes of the FLSA and that such activity is nothing more than free time, then such time is irrelevant to a calculation as to whether the deckhands spend more than 20% of their time on non-seaman duties because "[o]nly time spent *working* is considered in determining an employee's primary duty for FLSA exemption purposes." *Jarrett v. ERC Properties, Inc.*, 211 F.3d 1078, 1082 (8th Cir. 2000) (emphasis added).

C.     **Radwin's Report**

Plaintiffs support their argument that BHC has failed to demonstrate fulfillment of the (so-called) 80% rule solely upon Radwin's report.[8]  Importantly, however, Radwin's deposition testimony[9] and the accurate facts (as affirmed by BHC's Frederick L. Nolan III) demonstrate that Radwin employed an unscientific and unreliable test, the test methods were fraught with errors and mistakes, and therefore the conclusions he reached must be rejected in their entirety. Moreover, if the court does not reject Radwin's report as being irrelevant and unreliable, Radwin's conclusions actually support BHC's entitlement to summary judgment.

1.     **Radwin's Report Is Based Upon Untested And Unscientific Methodology**

Radwin was employed by plaintiffs' counsel "to design a study that would test the hypothesis that [BHC] employees spend less than 80% of their time performing certain kinds of activities that are related to the operation of a vessel." **Ex. H, Radwin Depo., p. 34, lines 11-15**. In response, Radwin designed a work sampling test whereby his "research assistant" was to observe BHC employees, at (allegedly) random intervals, and record what the BHC employee was doing. **Pltffs' Ex. 3, Radwin Report, pp. 3, 5-6**.  Based upon these observations, Radwin (allegedly) conducted a "statistical analysis of [the research assistant's] observations" in order to determine the percentages of all of the observations in terms of whether a particular observation was determined to be a maritime task (being group 1 activities), a non-maritime task (being group 2 activities), or a "doing nothing" task (being group 0 activities).  **Ex. H, Radwin Depo., p. 56, line 17; Pltffs' Ex. 3, Radwin Report, p. 7**.  As Radwin explained, the "study [was]

---

[8] The report of Robert G. Radwin, Ph.D., dated December 18, 2009, is attached to the Declaration of Plaintiffs' counsel, Charles E. Tompkins, as **Exhibit 3**.  It shall be referred to by BHC as "**Pltffs' Ex. 3, Radwin Report**," with appropriate references to page numbers and incorporated attachments.

[9] Radwin's deposition was taken by BHC's counsel and the transcript is attached as **Exhibit H** (the next letter in the sequence of exhibits previously submitted by BHC) and shall be referred to as "**Ex. H, Radwin Depo.**" with appropriate references to page and line numbers.

designed to measure what I report, and it's not intended to measure any more than that." **Ex. H, Radwin Depo., p. 124, lines 14-16**. In other words, by using "simple math," where Radwin counted up the total number of observations, divided by the total number of observations for each group activity (0, 1, or 2), Radwin calculated a percentage of the group 0, group 1 or group 2 tasks performed by the BHC employees, as observed the very moment it was observed and recorded during a discrete slice of time, whatever that may have been. **Ex. H, Radwin Depo., p. 128, lines 6-12, p. 129, lines 4-25, p. 130, lines 1-11**.

Plaintiffs' counsel instructed Radwin what tasks comprised each activity group (0, 1, or 2), and Radwin's assumption was that the tasks in activity groups 1 and 2 were the "total set of duties that [BHC] employees perform," and that the group 0 activities were "not work-related activities." **Ex. H, Radwin Depo., p. 58, lines 3-9, 19-20, p. 59, line 3**. The study was intended to observe all of the employees on board (except for the captain). **Ex. H, Radwin Depo., p. 69, lines 17-19**. It was not intended to observe individuals who were not employees working on the vessel, as that would not be representative of what employees do if one of the individuals studied was not an employee. **Ex. H, Radwin Depo., p. 73, lines 10-12**.

In order to carry out the random selection of those employees to be observed, Radwin provided his research assistant with an iPhone™, programmed to display the randomly determined time of day for an observation to be made, and the arbitrarily assigned worker number of the deckhand to be observed, based on how many employees the research assistant identified and entered into the iPhone™ when he boarded. **Ex. H, Radwin Depo., p. 60, lines 2-3, p. 64, lines 23-25, p. 65, line 1**. The research assistant was instructed to board as soon as passengers were permitted to board, to begin his observations when he boarded, and to continue his observations until after the vessel reached its intended destination, remaining on board the

vessel as long as he could, and being one of the last passengers to disembark.  **Ex. H, Radwin Depo., p. 86, lines 2-8, p. 90, lines 10-15**.

However, the iPhone™ program was manually commenced by the research assistant.  **Ex. H, Radwin Depo., p. 63, lines 18-21**.  In other words, the research assistant, after he boarded and "ha[d] gotten his bearings" would press a button on the iPhone™ and the iPhone™ would then display the time (i.e. the time of day) the research assistant was to make an observation.  **Ex. H, Radwin Depo., p. 63, lines 14- 17, p. 64, lines 15-17**.  After making the observation, the research assistant would record the activity group to which the observation belonged (e.g. group 1, 2 or 0).  **Pltffs' Ex. 3, Radwin Report, p. 6**.  Then, when the research assistant was ready to make his next observation, he would once again press the button and the program would display the next time an observation was to be made.  **Ex. H, Radwin Depo., p. 68, lines 13-14**.  Each and every time the research assistant was to make an observation, he manually activated the program on the iPhone™ in order that it display the time of day for the next observation to be made and the worker to be observed.  **Ex. H, Radwin Depo., p. 68, line 25, p. 69, line 1**.

BHC was not aware of the study being conducted aboard its vessels and Radwin had not ever previously conducted studies at workplaces where the employer was not aware of the fact that they were being conducted.  **Ex. H, Radwin Depo., p. 49, line 11, p. 50, lines 18-19**.  Radwin had never previously used the work sampling methodology he employed for the BHC assignment.  **Ex. H, Radwin Depo., p. 82, lines 4-5**.  Radwin did not employ videotaping in the study he designed for the BHC assignment, and could not recall time measurement studies conducted by him in the workplace where he did not employ videotaping.  **Ex. H, Radwin Depo., p. 37, line 17, p. 48, lines 7-8**.  In all such studies previously conducted by Radwin, where videotaping was employed, the videos were then analyzed by use of a software program to

precisely measure the amount of time that employees spent in various tasks. **Ex. H, Radwin Depo., p. 36, lines 17-21, 24**. This, too, was not employed by Radwin on the BHC assignment. **Ex. H, Radwin Depo., p. 48, lines 7-8**.

The individual who conducted the observations, identified by Radwin in his report as his "research assistant," who reportedly has been trained by Radwin "as to how to conduct a proper, scientifically-reliable time study, and ha[d] worked for [Radwin] on numerous time studies in the past, including studies that have been admitted in evidence by a federal court," **(Pltffs' Ex. 3, Radwin Report, p. 4**) is not Radwin's research assistant, has never been Radwin's research assistant, works in New Jersey helping his father run a flight school, was not ever a student of Radwin's, did not ever work in Radwin's laboratory and, before the BHC study, was used by Radwin on two or three other studies, only one of which was a matter in federal court. **Ex. H, Radwin Depo., p. 13, lines 22-25, p. 14, line 1, p. 51, lines 13-25, p. 52, lines 1-20, p. 53, lines 7-9, p. 54, lines 1-7**.

Radwin has no familiarity with what constitutes a seaman under the FLSA or what constitutes seaman duties, beyond being instructed by plaintiffs' counsel that group 1 activities were maritime activities, group 2 activities non-maritime activities,[10] and group 0 activities were not work related activities at all. **Ex. H, Radwin Depo., p. 59, line 3, p. 130, lines 17-18, p. 131, lines 15-16, p. 132, lines 14-21**. Radwin was instructed by plaintiffs' counsel to include all observations of BHC employees in the bridge, even observations of employees in the bridge

---

[10] Moreover, Radwin's conclusions as to the percentage of time BHC employees spent on group 2, non-maritime tasks are flawed given the inclusion in the group 2 tasks of duties that are clearly seaman functions, as a matter of law. If these duties were eliminated from group 2 and included in group 1, the percentages of non-maritime, group 2 activities would decrease below the calculated percentages, *none of which, as presently calculated, exceed 20% in any event*. Specifically, plaintiffs' counsel instructed Radwin that group 2 tasks were to include "housekeeping duties," "picking up trash," "sweeping and mopping," and "cleaning and sanitizing." **Pltffs' Ex. 3, Radwin Report, p. 4**. These four categories of tasks constitute 44.4% of all of the so-called group 2 tasks. Significantly, such tasks are, as a matter of law, seaman duties. *See* cases cited and analyzed in BHC's Memorandum of Law in Support of its Motion for Summary Judgment, pp. 16-21.

where the employee was engaged in conversation, as group 1, maritime, bridge watch activities. **Pltffs' Ex. 3, Radwin Report, p. 6; Ex. H, Radwin Depo., p. 92, lines 15-20**.   Radwin understood that this was in fact done and he so instructed his research assistant.   **Ex. H, Radwin Depo., p. 94, lines 6-25**.

Notwithstanding these instructions, and Radwin's understanding that all observations of BHC deckhands on the bridge were to be recorded as a group 1 activity, Radwin's explanation, when presented at deposition with the multiple observations of BHC employees in the bridge, categorized as group 0 activities, was that although his research assistant was not in the bridge, or on the bridge, he was able to tell that the individuals were "chatting," meaning that "they were having a conversation that did not appear to be related to the vessel."   **Ex. H, Radwin Depo., p. 94, lines 21-25, p. 95, lines 1-11**.   Specifically, Radwin offered that "it was clear that they were just having a casual conversation and didn't appear to be talking about anything more than, you know, things that are just casual conversation.   One could tell by how people wave their hands and how they talk it wasn't a conversation that appeared to be anything more than chatting."   **Ex. H, Radwin Depo., p. 95, lines 14-21**.   Although Radwin could not "recall" whether his research assistant overheard the conversation in the bridge, he did acknowledge that the bridge was not accessible, as he had accurately reflected in his report.   **Ex. H, Radwin Depo., p. 96, line 11**; **Pltffs' Ex. 3, Radwin Report, p. 6, n.4**.

With respect to the recording of conversations between deckhands and the captain or deckhands and other deckhands in the doing nothing, 0 group activity, Radwin offered that if it were not "obvious" that the conversation were of a "navigational nature," it was recorded as a doing nothing, group 0 activity.   **Ex. H, Radwin Depo., p. 110, line 22**.   Conversations that were

of an obvious navigational nature would be those "related to something about the boat." **Ex. H, Radwin Depo., p. 111, lines 8-9.**

Similarly, as to why an observation of a deckhand who was "watching riders" while the deckhand was sitting was recorded as a group 1 (maritime) activity (**Ex. H, Radwin Depo., p. 118, lines 13-18**), and the observation of a galley staff person who was "watching passengers" was recorded as a group 2 (non-maritime) activity (**Ex. H, Radwin Depo., p. 113, lines 5-24**), Radwin had this to say:

> I'm trying to explain what we have here; and this is the galley worker who was in the galley, and he's watching passengers, and that watching *doesn't appear* to be related to navigation.  (*Emphasis added*)

> If a galley worker...were watching passengers *and it wasn't from the galley* and it appeared as if they were watching passengers for the benefit of their safety and security, then it would have been recorded as a [group 1 (maritime) activity]. (*Emphasis added*)

> You can tell when a person is standing behind the counter and just staring out waiting for other customers to come that that's different than security observations where one might be gazing and looking at passengers *in a more determined, serious manner.*  (*Emphasis added*)

**Ex. H, Radwin Depo., p. 114, lines 6-10, p. 119, lines 21-25, p. 120, lines 1-2, 6-11**.

Plainly, the test employed was unscientific, being based upon observations of body language and hand movements.  Obviously, as well, the test was pre-disposed to not include galley staff as engaging in certain maritime tasks, including the watching of passengers.

Even were these defects not present, the test "was *not* designed to measure the percent of time that employees spend performing" the various tasks.  **Ex. H, Radwin Depo., p. 122, lines 20-23** (emphasis added).  Radwin was not "asked to calculate how much time" deckhands spent on tasks performed.  **Ex. H, Radwin Depo., p. 49, line 2**.  Rather, Radwin's assistant made observations as to tasks being performed, by persons who were assumed to be all deckhands

14

onboard, at the split second the observation was made, and then a mathematical calculation was made as to what percentage of the observed tasks were from one of three identified groups of tasks.

Simply, the test, what it measured, and its results do not support plaintiffs' assertion that they perform non-exempt work which occupies more than 20 percent of the time worked by them during the workweek.

### 2.    Radwin's Report Contains Multiple Errors And Cannot be Relied Upon

If the Court credits, as it should not (see discussion in Section B), plaintiffs' argument that BHC does not meet the (so-called) 80% rule, which plaintiffs support based upon Radwin's report in which he concludes that the deckhands and galley staff "spent more time doing nothing" than "on any other group of tasks," his conclusion is simply wrong.  **Pltffs' Ex. 3, Radwin Report, p. 7**.

Radwin concluded that the deckhands and galley staff spent 41% of their time doing nothing,[11] which Radwin stated was more time than that spent on any other group of tasks. **Pltffs' Ex. 3, Radwin Report, p. 7**.  This is obviously wrong, because Radwin also concluded that the deckhands and galley staff spent 45% of their time performing group 1 tasks, being maritime functions.[12]

---

[11] Interestingly, Radwin's assistant's observation worksheets, incorporated in Radwin's report as Attachment C and entitled "Data Sheets" ("worksheets"), upon which Radwin relied in calculating his findings and reaching his conclusions, identify that a group 0 observation constituted "[n]o discernable activity," not "nothing." **Pltffs' Ex. 3, Radwin Report, Attachment C.**

[12] As instructed by plaintiffs' counsel, these tasks were comprised of the following: "handling ropes and lines"; "look out duties (bridge watch standing, anchor watches and gangway watches)"; "routine maintenance (cleaning, painting and other activities)"; "security/safety patrols while vessel is underway"; "communicating with passengers (answering questions/responding to complaints)"; "loading and unloading passengers"; "training for emergency situations"; "using fire fighting and lifesaving equipment"; and "checking engine room." **Pltffs' Ex. 3, Radwin Report, pp. 3-4**.  Radwin testified that he understood that these tasks were maritime tasks and that the group 1 tasks were not maritime tasks, as they were "not associated with navigation or with the operation of the vessel." **Ex. H, Radwin Depo., p. 108, lines 24-25, p. 109, lines 1-3, p. 130, lines 16-18, p. 131, lines 14-16**.

In addition, Radwin also stated that he was instructed by plaintiffs' counsel and that he, in turn, instructed his research assistant, to include observations of deckhands and galley staff on the bridge as a group 1 "bridge watch" task for purposes of his analysis, and that he did so. **Pltffs' Ex. 3, Radwin Report, p. 6; Ex. H, Radwin Depo. p. 92, lines 14-25, p. 93, lines 1-25, p. 94, lines 1-2**. He did not.

The worksheets for the November 19, 2009 Boston to Charlestown run on the vessel Rita and the November 19, 2009 Charlestown to Boston run on the vessel Rita identify 33 separate observations of a crew member on the bridge as being a group 0 task (the "doing nothing" category). **Pltffs' Ex. 3, Radwin Report, Attachment C**. If, as Radwin states he was instructed to do, these 33 observations were included as a group 1 task, instead of as a group 0 task, the percentage of group 1 activities in the all employees, all runs analysis would increase from 45% to 53% and the percentage of group 0 activities would decrease from 41% to 30%. With respect to the Boston to Charlestown to Boston runs, viewed separately, during which runs the 33 observations occurred, the percentage of group 1 activities would increase from 51% to 68% and the percentage of group 0 activities would decrease from 33% to 16%.[13]

Two additional glaring errors undermine Radwin's report. First, observations were made of deckhand and galley staff on the vessel known as "Massachusetts," which observations are

---

[13] This calculation is a simple mathematical calculation, which is the manner in which Radwin reached the concluded percentages. **Ex. H, Radwin Depo., p. 128, line 12**. For the all groups, all runs calculations, he took the number of total observations (405), as compared to the number of observations in each group ("0," "1," and "2") and computed the percentage of each as compared to the total. So, for example, there were a total of 181 group 1 observations. This is 45% of the total number of observations, being 405. He did the same thing when separating out the observations of the Hingham to Boston to Hingham runs, and the Boston to Charlestown to Boston runs. The total observations of the separate runs and the total number of observations in each group (0, 1 or 2) are set forth in Radwin's report at Tables 2 and 4. With respect to the 33 mistakenly designated bridge observations on the November 19, 2009 Boston to Charlestown run and the November 19, 2009 Charlestown to Boston run, both on the vessel Rita, if the group 1 observations are increased by 33, for a total of 135, this is 68% of the total observations of 200 (instead of 102 at 51%--**Pltffs' Ex. 3, Radwin Report, p. 9, Table 4**) and if the group 0 observations are decreased by 33, for a total of 32, this is 16% of the total observations of 200 (instead of 65 at 33%-- **Pltffs' Ex. 3, Radwin Report, p. 9, Table 4**).

MCT/248033.1

included in Radwin's concluded percentages.  However, BHC does not own the vessel nor does it employ those individuals who work on the vessel.  **Ex. I, Nolan Affid. II, ¶3 (submitted herewith)**.  The vessel "Massachusetts," is owned by Massachusetts Bay Lines, Inc.  **Id**.  The vessel, staffed with its captain and crew, all of whom are employed by the vessel owner, is contracted by BHC to provide four commuter runs between Boston and Hingham, two in the morning and two in the afternoon.  **Id**.  As a result, the November 18, 2009 observations of deckhands and galley staff onboard the vessel Massachusetts (of which there were 20, with 17 of them (i.e. 85%) being categorized in the group 0 "doing nothing" category), are not legitimately included in Radwin's observations, and having been included, his conclusions are undeniably incorrect.  **Pltffs' Ex. 3, Radwin Report, Attachment C.**

Second, Radwin's worksheets demonstrate that with respect to three runs, deckhands were missed and, perhaps more importantly, with respect to one run, observations were made of a deckhand who was not on duty but instead was riding from Hingham to Boston as a passenger.

Specifically, on the November 18, 2009 Hingham to Boston run on the vessel Nora Vittoria departing at 6 am, four crew were onboard and working on the vessel.  **Ex. I, Nolan Affid. II, ¶4**.  The worksheet prepared by Radwin's research assistant identifies only three crew.  **Pltffs' Ex. 3, Radwin Report, Attachment C**.  Similarly, on the November 18, 2009 Hingham to Boston run on the vessel Salacia, four crew were onboard and working on the vessel.  Present also was a fifth individual, being an engineer.  **Ex. I, Nolan Affid. II, ¶5**.  The worksheet identifies only three crew members.  **Pltffs' Ex. 3, Radwin Report, Attachment C.**  Similarly, on the November 18, 2009 Boston to Hingham run on the vessel Nora Vittoria departing at 7 pm, five crew were onboard and working on the vessel, yet Radwin's worksheet identifies only four.  **Ex. I, Nolan Affid. II, ¶6; Pltffs' Ex. 3, Radwin Report, Attachment C**.

Finally, only three crew were onboard and working the November 18, 2009 Hingham to Boston run on the vessel Laura. **Ex. I, Nolan Affid. II, ¶7**. However, Radwin's worksheet identifies four crew. **Pltffs' Ex. 3, Radwin Report, Attachment C**.[14] Significantly, the crew member identified by Radwin as worker number 1 was observed eight times and all eight observations found him reading a book or sleeping,[15] all being categorized in the group 0, "doing nothing" category. **Pltffs' Ex. 3, Radwin Report, Attachment C.** BHC has determined that this individual, who does work as a deckhand for BHC, was riding the vessel from Hingham to Boston, where the vessel on which he was assigned to work that day was located. **Ex. I, Nolan Affid. II, ¶7**. Crew frequently ride BHC's vessels as passengers from Hingham to Boston, where they board BHC's other vessels, located in Boston, on which they are scheduled to work. **Id.**

Plainly, Radwin's report contains several errors and mistakes and is unreliable. No argument advanced by plaintiffs, premised upon Radwin's report, is entitled to any credence. Without it, plaintiffs do not put forth any competent evidence of a dispute of material fact as to BHC's evidence of plaintiffs' seaman duties, performed by them at all times on the vessels (where each of the two representative plaintiffs testified they performed 95% (as to McGrath) and "pretty much" 100% (as to McLaughlin) of their work). **Ex. E, McGrath Depo. p. 92, lines 11-13; Ex. G, McLaughlin Depo. p. 49, lines 3-12**.

---

[14] Radwin admits that if this had occurred, the observations noted "would not be representative of what employees do." **Ex. H, Radwin Depo. p. 73, lines 4-12**.

[15] Plaintiffs point out that McLaughlin testified that in between runs he would "nap." **Opposition Brief, p. 5, n.5**. He also testified that he undertook several tasks in between runs, including restocking the vessel, fueling the vessel and cleaning the vessel. **Ex. G, p. 103, line7, p. 107, lines 8-11**. Importantly, BHC's Jon Veiga, whose deposition transcript was attached to the Declaration of plaintiffs' counsel, Charles E. Tompkins as Exhibit 1 ("**Pltffs' Ex. 1**"), testified that if a deckhand were sleeping on the vessel, it would be grounds for termination. **Pltffs' Ex. 1, p. 141, lines 2-4**.

**3.    Assuming, *Arguendo*, That Radwin's Report Is Relevant and Reliable, It Actually Supports BHC's Entitlement To Summary Judgment**

Radwin identified activity group 2 as being comprised of specific, non-maritime tasks as instructed by plaintiffs' counsel.  **Pltffs' Ex. 3, Radwin Report, pp. 3-4; Ex. H, Radwin Depo., p. 131, lines 14-16**.  No matter whether analyzed separately or together (i.e. group 2 tasks performed by deck hands alone, so-called galley staff alone, or deckhands and galley staff together), Radwin did *not* conclude that greater than 20% of the observed tasks in group 2 were undertaken by BHC deckhands and/or galley staff.   Specifically, viewed collectively, with respect to all observed runs,[16]  Radwin concluded that BHC deckhand and galley staff spent 15% of their time engaged in group 2 activities.  **Pltffs' Ex. 3, Radwin Report, p. 7**.

With respect to the Hingham to Boston and Boston to Hingham runs, deckhands and galley staff, collectively, spent 12% of their time on group 2 tasks.  **Pltffs' Ex. 3, Radwin Report, p. 8, Table 2**.  Viewed separately, deckhands spent 8% and galley staff 20% of their time on group 2 tasks.  **Pltffs' Ex. 3, Radwin Report, p. 8, Table 3**.

With respect to the Boston to Charlestown and Charlestown to Boston runs, the BHC employees, whom Radwin concluded functioned as both deckhand and galley staff (**Pltffs' Ex. 3, Radwin Report, p. 7, n.5**),[17] spent 17% of their time on group 2 tasks.  **Pltffs' Ex. 3, Radwin Report, p. 9, Table 4**.

Importantly, Radwin did *not* conclude that *greater than* 20% of group 2 tasks was performed by deckhands, or galley staff, or both.

---

[16] Radwin's report is not specific that the collective observations include all observed employees on all observed runs (i.e., between Hingham and Boston and between Boston and Charlestown).  **Pltffs' Ex. 3, Radwin Report, p. 7**.  However, Radwin testified at his deposition that the collective observations did indeed include all employees on all runs.  **Ex. H, Radwin Depo. p. 76, line 25, p. 77, lines 1-13**.

[17] This is factually inaccurate as there is *no operational galley* on the vessels transporting passengers between Boston and Charlestown.  **Ex. A, Nolan Affid. ¶20**.

**D.     Absent Radwin's Report, There Is No Dispute Of Material Fact As To Plaintiffs' Seaman Duties, Performed By Deckhands At All Times On The Vessels**

Although plaintiffs assert that there is a dispute as to whether each of them performed certain discrete duties, in fact either there is no dispute, or the disputes are not material. Importantly, also, the disputes are not supported by plaintiffs' offered evidence.

Plaintiffs argue that deckhands did not do anything that helped navigate the vessel, based upon McLaughlin's deposition testimony (in response to a question from his counsel)[18] that he did "not really" do anything that helped navigate the vessel.  **Opposition Brief, p. 8**.  As McLaughlin explained, what he understood was meant by "navigate," was "look[ing] at the radar, "look[ing] out for other vessels or bridges or something like that," and "driving" the vessel.  **Ex. G, McLaughlin Depo. p. 104, line 24; p. 105, lines 1-8**.  However, McLaughlin also testified that he did indeed monitor the vessel's GPS (which stands for global positioning system), watched for buoys and hazards, drove the vessel, and docked it as well.  **Ex. G, McLaughlin Depo. p. 65, lines 5-24; p. 66, lines 1-5, 17-21; p. 81, lines 11-23**.

Plaintiffs argue that deckhands did not regularly or even rarely enter coordinates into a vessel's GPS based upon McLaughlin's deposition testimony that *he* did not enter coordinates into a vessel's GPS.  **Opposition Brief, p. 8**.  BHC did not assert that deckhands entered coordinates into a vessel's GPS.  McLaughlin did, however, testify that he assisted the captain by monitoring the GPS.  **Ex. G, McLaughlin Depo. p. 81, lines 11-15**.

Plaintiffs also assert that deckhands did not participate in maintenance projects on the vessels, again based upon McLaughlin's deposition testimony that *he* did not do so.  **Opposition Brief, p. 8**.  BHC noted in its Memorandum (**at p. 26**) that McLaughlin did not participate in

---

[18] This question from plaintiffs' own counsel clearly relates to the position continually asserted by plaintiffs that seaman duties are those limited to being in "aid of navigation."

maintenance projects.   However, McLaughlin testified that he did change light bulbs on the vessels, and performed routine maintenance and cleaning activities.  **Ex. G, McLaughlin Depo. p. 87, lines 4-7, p. 89, lines 15-17, p. 90, lines 13-16, Errata sheet, p. 91, lines 14-24, p. 92, lines 1-3; Exhibit J**.[19]

Plaintiffs assert that deckhands did not typically keep an eye on passengers while vessels were underway, based upon McLaughlin's deposition testimony that he did "not really" do so. **Opposition Brief, p. 8**.  However, McLaughlin supplemented his testimony on his Errata sheet, when he wrote that "on whale watches there were more children so you would keep an eye on them."  **Ex. G, McLaughlin Depo. p. 92, lines 18-19, Errata Sheet**.  McGrath also testified that she "ke[pt] an eye on passengers" and reported anything she thought was wrong or amiss to the captain or other crew.  **Ex. E, McGrath Depo. p. 70, lines 11-23**.

Significantly, and contrary to plaintiffs' representations, McGrath did not testify as to what any deckhands assigned to the galley did or did not do, except for herself.  And, moreover, although McGrath did state (as indicated by plaintiffs in their **Opposition Brief, p. 9**) that she did not report head counts to the captain, in her Errata sheet she stated that she "probably did" so. **Ex. E, McGrath Depo. p. 98, lines 15-17, Errata sheet**.  Similarly, although McGrath testified, flippantly, that she handled lines when she felt like it, when she was bored, she admitted that she did handle lines, but did not view such a task as being her responsibility.  **Ex. E, McGrath Depo. p. 86, lines 19-23, p. 87, lines 6-10**.

### E.        Conclusion

Based upon the undisputed facts, and the law, BHC respectfully requests that the court enter summary judgment in its favor.

---

[19] **Exhibit J**, submitted herewith, is a copy of those pages from BHC's Crew Member Orientation and Training Manual to which McLaughlin was referring in his deposition testimony, as cited.

Respectfully submitted,

**HARBOR CRUISES LLC,**
**NOLAN ASSOCIATES LLC AND**
**FREDERICK L. NOLAN, III**

By their attorneys,


**/s/ Mary E. O'Neal**
MARY E. O'NEAL--BBO # 379325
PATRICIA A. GRANGER--BBO# 565993
**MASTERMAN, CULBERT & TULLY LLP**
One Lewis Wharf
Boston, Massachusetts 02110
(617) 722-8100

Dated:  June 7, 2010

## CERTIFICATE OF SERVICE

I, Mary E. O'Neal, Attorney for Defendants, hereby certify that the foregoing Defendant's Response to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of the Electronic Filing.


**/s/ Mary E. O'Neal**
MARY E. O'NEAL

Dated:  June 7, 2010

MCT/248033.1