UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 06-11299-GAO

CHRIS MCLAUGHLIN and SANDRA MCGRATH,
Individually and on Behalf of All Other Persons Similarly Situated,
Plaintiffs,

v.

HARBOR CRUISES LLC and NOLAN ASSOCIATES LLC (both d/b/a "Boston Harbor Cruises") and FREDERICK L. NOLAN, III,
Defendants.

OPINION AND ORDER
July 20, 2012

O'TOOLE, D.J.

The Fair Labor Standards Act ("FLSA") establishes a general rule that employers must pay employees at a "rate not less than one and one-half times the 'regular rate'" for all overtime hours that an employee works. 29 U.S.C. § 207(a)(1). The statute, however, provides several exemptions from that mandate, and one of those exempts from the overtime requirement "any employee employed as a seaman." Id. § 213(b)(6).

The defendants (collectively either "Boston Harbor Cruises" or "BHC") employed the plaintiffs to work on a variety of passenger vessels operated by the defendants and, classifying the plaintiffs either as "deckhands" or "galley attendants," treated them as exempt from the FLSA's overtime requirement under the "seaman" exemption. In this action, the plaintiffs seek to recover overtime wages they say were wrongfully withheld, contending that the "seaman" exemption is inapplicable to them.[1] The defendants, though they bear the burden of proof that

---

[1]The plaintiffs also present two claims under the Massachusetts overtime statute, Mass. Gen. Laws ch. 151, §§ 1A and 1B, one on behalf of the deckhands, and another on behalf of the galley

1

the exemption applies, see Reich v. John Alden Life Ins. Co., 126 F.3d 1, 7 (1st Cir. 1997), have moved for summary judgment, contending in substance that on the undisputed facts, no rational jury, properly instructed, could fail to conclude that the plaintiffs fell within the scope of the "seaman" exemption.

**I.      The Statute and Applicable Regulations**

The history of the enactment of the "seaman" exemption to the FLSA's wage provisions[2] was recounted by the Court of Appeals in Walling v. Bay State Dredging & Contracting Co., 149 F.2d 346, 349-50 (1st Cir. 1945). In summary, Congress included the exemption at the urging of "representatives of the chief labor organizations representing seamen," who were apparently content to have the working conditions of seamen regulated under the Merchant Marine Act of 1936 and were concerned about potentially conflicting regulation under the FLSA. Id.

In enacting the exemption, Congress did not define the term "seaman." 29 U.S.C. § 213(b). See McLaughlin v. Boston Harbor Cruise Lines, 419 F.3d 47, 50 (1st Cir. 2005). The circumstances of its origin might suggest that it was intended more or less to coincide with the meaning of the term as used generally in maritime law, but courts have resisted the argument that the maritime definition of the term (as for purposes of the Jones Act, for example) must necessarily govern the interpretation of the term as used in the FLSA. See, e.g., Harkins v.

---

attendants. Like the FLSA, that statute provides an exemption for seamen. There are no Massachusetts cases specifically addressing the scope of the state exemption. However, the state courts have said that they will ordinarily follow the interpretation given cognate federal exemptions by the federal courts. See McLaughlin v. Boston Harbor Cruise Lines, 419 F.3d 47, 53 (1st Cir. 2005), citing Goodrow v. Lane Bryant, Inc., 732 N.E.2d 289, 294 (Mass. 2000). See also, Valerio v. Putnam Assocs., Inc., 173 F.3d 35, 40 (1st Cir. 1999). Consequently, the question of the interpretation and scope of the "seaman" exemption will as a practical matter be given the same answer under either statute.

[2] It is the overtime provisions of 29 U.S.C. § 207 that are in issue in this case. There is a similar but more limited "seaman" exemption to the minimum wage provisions of the statute. 29 U.S.C. § 213(a)(12).

Riverboat Servs., Inc., 385 F.3d 1099, 1102 (7th Cir. 2004) (stating that "decisions interpreting the term 'seaman' in other statutes do not necessarily control its meaning in the FLSA")[3] and Sternberg Dredging Co. v. Walling, 158 F.2d 678, 680-81 (8th Cir. 1946).  Rather, courts have repeatedly emphasized that a general definition is not to be attempted; whether an employee qualifies as a "seaman" for purposes of the exemption is a "quite fact-intensive" question. McLaughlin, 419 F.3d at 51; id. at 58 (Lipez, J., concurring) (emphasizing "the inescapably fact-specific nature of the seaman inquiry").  See also, Bay State Dredging, 149 F.2d at 351 (determining who is a seaman "depends a good deal upon the facts in each case, especially the character of the work that is principally engaged in"). Pertinent instructive cases are discussed further *infra*, at Section II.

The U.S. Department of Labor ("DOL") has promulgated regulations addressing the "seaman" exemption. 29 C.F.R. § 783.0 *et seq.* Under the regulations,

> an employee will ordinarily be regarded as "employed as a seaman" if he performs, as master or subject to the authority, direction, and control of the master aboard a vessel, service which is rendered primarily as an aid in the operation of such vessel as a means of transportation, provided he performs no substantial work of a different character.

Id. § 783.31.

> For enforcement purposes, the Administrator's position is that such differing work is "substantial" if it occupies more than 20 percent of the time worked by the employee during the workweek.

Id. § 783.37.

---

[3] Harkins also applied a rebuttable presumption that a worker who is a "seaman" for purposes of the Jones Act would also be a "seaman" for purposes of the FLSA. 385 F.3d 1103.  The First Circuit has not taken that position, and for present purposes it will be assumed that there is no such presumption applicable here.

The DOL regulations follow the judicial consensus in stating that "[w]hether an employee is 'employed as a seaman' . . . depends upon the character of the work he actually performs." Id. § 783.33.

> [O]ne is not employed as a seaman within the meaning of the Act unless one's services are rendered primarily as an aid in the operation of the vessel as a means of transportation, as for example services performed substantially as an aid to the vessel in navigation.

Id.

The regulations supplement these general principles with some illustrations:

> The term 'seaman' includes members of the crew such as sailors, engineers, radio operators, firemen, pursers, surgeons, cooks, and stewards if, as is the usual case, their service is of the type described in §783.31[4]. . . . . [A]n employee employed as a seaman does not lose his status as such simply because, as an incident to such employment, he performs some work not connected with the operation of the vessel as a means of transportation, such as assisting in the loading or unloading of freight at the beginning or end of a voyage, if the amount of such work is not substantial.

Id., §783.32.

In summary, then, under the DOL regulations, an employee is to be considered a "seaman" for purposes of the exemption if he (1) works aboard a vessel, (2) is subject to the control of the master of the vessel, (3) performs work that is rendered primarily as an aid in the operation of the vessel as a means of transportation, and (4) performs only incidental, and not substantial, work of a different character.

---

[4] That is, "if he performs, as master or subject to the authority, direction, and control of the master aboard a vessel, service which is rendered primarily as an aid in the operation of such vessel as a means of transportation, provided he performs no substantial work of a different character." 29 C.F.R. § 783.31.

4

**II.     Pertinent Instructive Cases**

Given the fact-bound nature of the question, courts have closely examined the work duties involved in deciding whether the exemption applies. For example, there are a number of cases dealing with whether workers on a dredging barge would qualify for the exemption. The exemption has been held to apply where the duties of the workers on the barge involved various traditional maritime tasks such as cleaning the decks, handling lines, maintaining equipment on the barge, pumping bilges, keeping watch, and performing various safety-related tasks.[5] On the other hand, workers whose duties were related to the dredging operation itself rather than to the operation of the barge as a means of transportation have been held to fall outside the "seaman" exemption.[6]

The reasoning in the latter group of cases seems to be that workers who are on the barge only so they can be transported to the place where they will do their primary work, dredging, are not serving, as § 783.31 puts it, "as an aid to the operation of such vessel as a means of transportation," and thus not within the exemption. This principle has been extended from the dredging barge cases to others where workers are on the vessel so that they can perform work

---

[5] See, e.g., in the First Circuit: Jordan v. Am. Oil, 51 F.Supp. 77 (D.R.I. 1943); Bolan v. Bay State Dredging, 48 F.Supp. 166 (D. Mass. 1942); in the Second Circuit: Martin v. McAllister Ligherage Line, 205 F.2d 623 (2d Cir. 1953); in the Third Circuit: Bailey v. Pilots' Ass'n for Bay and River Delaware, 406 F.Supp. 1302 (E.D. Pa. 1976); Walling v. Keansburg Steamboat Co., 162 F.2d 405 (3d Cir. 1947); in the Fourth Circuit: McMahan v. Adept Process Serv., Inc., 2011 WL 2039092 (E.D. Va. May 24, 2011); in the Fifth Circuit: Louviere v. Standard Dredging Corp., 239 F.2d 164 (5th Cir. 1956); Gale v. Union Bag & Paper Corp., 116 F.2d 27 (5th Cir. 1940); in the Sixth Circuit: Weaver v. Pittsburgh S.S. Co., 153 F.2d 597 (6th Cir. 1946); in the Eleventh Circuit: Selby v. Yacht Starship, 624 F. Supp. 2d 1367 (M.D. Fla. 2008).

[6] See, e.g., in the First Circuit: Walling v. Bay State Dredging, 149 F.2d 346 (1st Cir. 1945); in the Fifth Circuit: Walling v. W.D. Haden Co., (5th Cir. 1946); in the Seventh Circuit: Walling v. Great Lakes Dredge & Dock Co., 149 F.2d 9 (7th Cir. 1945); in the Eighth Circuit: Sternberg Dredging Co. v. Walling, 158 F.2d 678 (8th Cir. 1947).

unrelated to the work of the vessel, such as conducting scientific studies,[7] servicing offshore oil wells,[8] or performing lumbering and forestry work.[9]

Other cases echo general maritime cases in policing the familiar, if at times uncertain, line between "seamen" and "longshore workers." Thus, workers whose duties are primarily related to loading or unloading cargo have been held not to be within the exemption.[10] Similarly, the exemption was held not to apply to workers who supervised the collection of fares and the parking of cars on a ferryboat.[11]

Harkins, dealing with workers on a casino boat, also addressed the "seaman" exemption. There the Seventh Circuit posited a rebuttable presumption that a worker who was covered as a "seaman" under the Jones Act and other protective general maritime law should fall within the definition of "seaman" in the FLSA exemption. 385 F.3d 1103. In considering whether the presumption had been rebutted, the court described the workers at issue as part of the "marine crew" of the boat, though most of them had some sort of housekeeping responsibilities rather than duties related to navigation. Id. at 1100. The court affirmed a jury verdict that the exemption applied, noting that the plaintiffs "were not waiters or croupiers, but instead were responsible for the operation of the ship or (as comprehended within that term) the safety of the ship's passengers." Id.

---

[7] Donovan v. Dekton, Inc., 703 F.2d 1148 (9th Cir. 1983); Marshall v. Woods Hole Oceanographic Inst., 458 F.Supp. 709 (D. Mass. 1972).
[8] Dole v. Petroleum Treaters, Inc., 876 F.2d 518 (5th Cir. 1989).
[9] Woods Lumber Co. v. Tobin, 199 F.2d 455 (6th Cir. 1952).
[10] Owens v. Seariver Mar., Inc., 272 F.3d 698 (5th Cir. 2001); Knudsen v. Lee & Simmons, 163 F.2d 95 (2d Cir. 1947); McCarthy v. Wright & Cobb Lighterage Co., 163 F.2d 92 (2d Cir. 1947).
[11] Duke v. Helena-Glensdale Ferry Co., 159 S.W. 2d 74 (Ark. 1942).

In a case following Harkins that also involved a casino boat, the court concluded that for employees who performed work that was clearly maritime in nature the exemption was not avoided because they also provided various security, cleaning or "housekeeping" services. Tate v. Showboat Marina Casino P'ship, 357 F .Supp. 2d 1075, 1081-85 (N.D. Ill. 2005).

### III. The Facts of the Case

The following facts are not disputed:

Boston Harbor Cruises operates approximately twenty passenger vessels in and around the Boston Harbor and surrounding areas. The vessels are used only for the transportation of passengers; they are not operated as carriers of cargo. Some vessels provide transportation for commuters to and from Hingham, Charlestown, and Boston. Some vessels travel between Boston and Provincetown. Some vessels transport passengers on whale watches, private cruises, and other pleasure excursions.

All of BHC's vessels are subject to statutory and regulatory authority enforced by the United States Coast Guard. The Coast Guard determines the class, type, and number of lifesaving and firefighting equipment, the maximum number of passengers permitted to be carried, the permitted routes, and of particular importance here, the minimum number of licensed or unlicensed crew who must be aboard a vessel in order for it to be operated for the transportation of passengers. The Coast Guard determines the minimum staffing complement by inspecting each vessel and issuing a certificate of inspection ("COI") indicating the required number of crew members. See 46 U.S.C. § 8101.[12] For example, for BHC's vessel *Laura*, the COI requires the presence of a master and four deckhands. (Defs. Mem. in Supp. of Mot. For

---

[12] Section 8101 provides in relevant part: "The certificate of inspection issued to a vessel under part B of this subtitle shall state the complement of licensed individuals and crew (including lifeboatmen) considered by the Secretary to be necessary for safe operation."

7

Summ. J., Ex. 1 at 61 (dkt. no. 161-1).) For the *Nora Vittoria*, the COI requires a master, one licensed mate, and four deckhands. (Id. at 83.) The *Salacia* is required to have a master, one licensed mate, and six deckhands. (Id. at 92.)

BHC vessels sail with the number of crew required for the number of passengers to be transported on the voyage. Put another way, for every voyage, each crew member's presence is essential to the vessel's compliance with the Coast Guard staffing requirement.

BHC classifies its unlicensed crew members as deckhands. On vessels with operational galleys, BHC assigns a deckhand to work in the galley as a "galley attendant." Under Coast Guard policy, "some or all of the deckhands may be permitted to perform duties such as concessionaires, waiters or waitresses provided that they can readily respond to their regularly assigned deckhand duties." (Id. at 103.) ("U.S. Coast Guard Navigation and Inspection Circular No. 1-91".) Typically, the galley on a BHC vessel would be staffed by only one person; occasionally a second person might help out at busy times on the larger vessels.

The galley is an area on the main deck of a vessel from which pre-packaged items are sold, including beverages (soda and beer in cans, wine in single serving containers) and food (snacks, pastries, and packaged sandwiches). No food is prepared in the galley. The galley is equipped with a telephone to the bridge.

BHC trains its employees using a "Crew Member Orientation and Training Manual." (Defs. Mem. in Supp. of Mot. For Summ. J., Ex. 2 at 27-74 (dkt. no. 161-2).) Among many other things, including a glossary of nautical terms and instructions on knot-tying, the manual lists the duties of deckhands and galley attendants. According to the manual, a deckhand's duties include:

1. Responsible to the Master for passenger operation and maintenance of the vessel.

2. Responsible to the Senior Deckhand for maintenance, stores handling, line handling, as directed by the Master.

3. Performs lookout duties, bridge watch standing, anchor watches, and gangway watches.

4. Performs housekeeping duties.

5. Performs routine maintenance, cleaning, painting, and other activities.

6. Picks up trash on passenger decks.

7. Sweep and mop decks in assigned areas.

8. Maintains vessel in clean and sanitary condition.

9. Performs security/safety patrols of all decks while vessel is underway. Communicates with passengers, answering questions and responding to complaints.

10. Performs loading and unloading of passengers.

11. Performs tasks necessary to keep the vessel clean, safe, and in good order.

12. Assist in directing passengers ashore and aboard.

13. Learns maintenance, handling ropes and lines, and standing watches on the bridge as well as how to handle fire fighting and lifesaving equipment.

14. Ability to work in confined spaces.

15. Performs any other duties assigned.

(Id. at 55.)  The manual also describes the duties of a galley attendant:

1. Responsible for set up of galley/concession stand.

2. Responsible for cleanliness and order of galley area and storeroom.

    3. Responsible for maintaining proper stock of galley supplies.

    4. Responsible for bank and register operation.

    5. Responsible for smooth operation of concession stand throughout the day.

    6. Takes part in crew safety drills.

    7. Assists deckhands with line handling and mooring operations as directed by the Senior Deckhand.

    8. Performs housekeeping duties.

    9. Picks up trash on passenger decks.

    10. Sweep and mop decks in assigned areas.

    11. Maintains galley in clean and sanitary condition.

    12. Assists with loading and unloading of passengers when necessary.

    13. Performs any other duties assigned.

(Id. at 56.)

Deckhands and galley attendants wear the same uniform: Khaki pants or shorts; clean all white sneakers or light tan work boots; navy blue polo shirt; company issued hat with BHC logo; and company issued sweatshirt, jacket or windbreaker with BHC logo. (Id. at 30-1.) The common uniform makes the members of the crew easily identifiable to passengers.

In their respective depositions, named plaintiffs Christopher McLaughlin and Sandra McGrath acknowledged that when they each were employed at BHC they performed services related to the operation of the vessel. (Defs. Mem. in Supp. of Mot. For Summ. J., Ex. 6 (herein after "McGrath") and Ex. 8 (herein after "McLaughlin") (dkt. nos. 161-6 & 161-8).) They both acknowledged handling lines (McGrath at 16; McLaughlin at 14.) helping with the gangway

(McGrath at 18; McLaughlin at 14.), and participating in safety drills (McGrath at 12; McLaughlin at 8.)

In addition, McLaughlin testified that among other things he also conducted engine room checks (McLaughlin at 13; McLaughlin at 15), washed down the vessel (McLaughlin at 15), conducted a head count of passengers to assure compliance with the COI (McLaughlin at 7), helped keep watch in foggy or foul weather (McLaughlin at 12; 13; 15), sometimes monitored the GPS device (McLaughlin at 15), on occasion drove the boat in relief of the captain (McLaughlin at 12) and was taught how to dock the boat (McLaughlin at 12), and even occasionally filled in as a galley attendant (McLaughlin at 6.)

While McGrath spent most of her time in the galley, she also responded as necessary to safety emergencies. On one occasion she assisted a passenger who became ill (McGrath at 14.) On another occasion she assisted in responding to a collision with another vessel (McGrath at 14-15.) When necessary, she communicated with the captain by phone from the galley to the wheelhouse about passenger safety (McGrath at 13.) She had hooked up shore power to the vessel (McGrath at 21.)

Both McLaughlin and McGrath performed almost all their work aboard the vessel (McLaughlin at 9-10; McGrath at 17.) Both worked under the direction of and reported to the captain (McLaughlin at 9; McGrath at 12.)

While the foregoing facts are not genuinely disputed, the plaintiffs do dispute how often they performed certain duties and/or how much time they spent doing them. They also assert that they spent a good deal of time in idleness, "sitting in the galley . . . talking, hanging out." (McLaughlin at 17.) This latter assertion is not disputed by the defendants.

**IV.**    **Resolution of the Motion for Summary Judgment**

As discussed above, the "seaman" exemption, as interpreted by the DOL regulations, applies to an employee who (1) works aboard a vessel, (2) is subject to the control of the master of the vessel, (3) performs work that is rendered primarily as an aid in the operation of the vessel as a means of transportation, and (4) performs only incidental, and not substantial, work of a different character. See 29 C.F.R. § 783.31. There is no dispute that the deckhands and galley attendants, personified by named plaintiffs McLaughlin and McGrath, meet the first two criteria: their work is almost exclusively performed aboard a BHC vessel subject to the control of the captain of the vessel. The resolution of the present issue turns on whether the plaintiffs meet the third and fourth criteria.

The work done by general deckhands, that is, those who are not assigned primarily to the galley of the vessel, is clearly "service . . . rendered primarily in aid of the operation of the vessel as a means of transportation."  The record establishes that these employees handle the vessel's lines and gangway, participate in mooring the vessel, assist passengers to embark and disembark, keep count of the passengers aboard, perform necessary housekeeping tasks to keep the vessel clean and safe, keep watch as needed, occasionally relieve the captain at the wheel, perform safety inspections and drills, conduct engine and bilge checks and perform repairs as necessary, observe security precautions, and serve as identifiable representatives of the vessel to the passengers.  These are all duties related to the safe operation of the vessel as a means of transportation. This conclusion is fully consistent with the pattern of holdings that emerges from the cases discussed above.

Whether BHC's galley attendants like McGrath fall within the exemption requires closer consideration. The record establishes that they are expected to be, and are, available to perform the duties of general deckhands when necessary. The galley attendants wear the same uniforms as general deckhands and are thus identified to passengers as members of the crew, undistinguished from the general deckhands. Even while stationed in the galley, the galley attendants have the same housekeeping responsibilities that other deckhands have to keep the deck clean and free of trash. They share the same responsibility to observe conditions on the boat generally in the interest of safety and security. In fact, McGrath testified in her deposition about an occasion when she called the captain on the galley phone because she had observed some children too far forward on the bow and was concerned for their safety. (McGrath at 13.)

That said, it is also evident from the record that the galley attendants staff the galley as their primary work responsibility. The question arises, then, is that work rendered "as an aid in the operation of [the] vessel as a means of transportation," or is it "work of a different character?" 29 C.F.R. § 783.31.

The DOL regulations offer some limited guidance. First, while work done by a seaman must be an "aid in the operation of the vessel," it need not be directly related to navigation. Regulation § 783.33 provides:

> [O]ne is not employed as a seaman within the meaning of the Act unless one's services are rendered primarily as an aid in the operation of the vessel as a means of transportation, as for example services performed substantially as an aid to the vessel in navigation.

Notably, "aid to the vessel in navigation" is mentioned as one example of "aid in the operation of the vessel," not as a complete definition of that term. Further, another regulation, § 783.32, gives

some illustrations of the types of crew members who might meet the criterion of giving "aid in the operation of the vessel," including "sailors, engineers, radio operators, firemen, *pursers, surgeons, cooks, and stewards*." 29 C.F.R. § 783.32 (emphasis added). Pursers, surgeons, cooks, and stewards may aid in the operation of the vessel by supporting its mission in their respective particular ways, but they do not generally have primary duties related to navigation. Accordingly, a galley attendant is not excluded from the category of crew members who "aid in the operation of [the] vessel" simply because, like "pursers, surgeons, cooks, and stewards," her primary duty aboard the vessel is not directly involved with navigation.

Moreover, the inclusion of "pursers, surgeons, cooks, and stewards" as illustrations of persons who, as members of a crew of a vessel, could be considered "seamen" suggests that an employee is not excluded from "seaman" status simply because the employee does work of a kind that could be done on land. It might be suggested that if the work done could be done the same way on land as on a vessel, then the work itself is not sufficiently nautical for the employee to be considered a "seaman." This is too simple a test. To take an obvious example, a ship's cook can provide essential aid in the operation of the vessel by keeping the rest of the crew fed. The fact that cooking can also be land-based work does not alter this fact.

The suggestion in the regulation that "stewards" can be "seamen" is particularly interesting for this case. While the work of surgeons and cooks, and perhaps pursers may in many circumstances be done mainly for the benefit of the crew, the work of stewards is at least as likely to focus on the vessel's non-crew passengers. Pursers, surgeons, and cooks can also, of course, perform work for the benefit of a vessel's passengers. The operation of a vessel as a means of transportation of passengers necessarily entails attention by some employees working on the vessel to the service of the passengers. Serving drinks and snacks to passengers could

easily be considered part of the "operation of the vessel" in this sense, and those that do that work could thus, consistent with § 783.32, be considered "seamen."

Of course, this idea could also be pushed too far -- to include, say, a blackjack dealer on a gambling boat -- beyond what would seem sensible for a definition of who a "seaman" is. See Harkins, 385 F.3d at 1104. Nonetheless, the fact that an employee performs work that primarily serves the passengers, as opposed to the crew, does not necessarily exclude that work from being considered work "in aid of the operation of the vessel as a means of transportation."

Indeed, even an instinctive impulse to exclude blackjack dealers from being considered members of the marine crew might lose some force if it were the case that the dealers also handled lines, manned the gangway, performed vessel housekeeping, observed the passengers in the interests of safety, helped in emergencies, and were counted as part of the essential sailing complement for purposes of Coast Guard regulations. Here the record shows that BHC galley attendants performed all of those seaman-like services in addition to serving the passengers snacks and drinks. A familiar congener is the flight attendant (or "steward") aboard a commercial airliner who, as a member of the crew, is responsible for a variety of duties, none of which is directly related to flying the plane, but all of which "aid in the operation of [the plane] as a means of transportation." That conclusion is not diminished because the flight attendants serve snacks and drinks to the passengers.

In opposing the defendants' motion for summary judgment, the plaintiffs rely heavily on a report by an ergonomics expert, Dr. Robert G. Radwin, who designed and supervised a time study of how much time BHC deckhands and galley attendants spent doing various tasks. In summary, Dr. Radwin concluded that both deckhands and galley attendants spent a substantial

amount of their working time on non-seaman duties. Under DOL regulations, this would leave them outside the "seaman" exemption. See 29 C.F.R. §§ 783.32, 783.37.

The report does not prove what the plaintiffs claim. There appear to be a number of flaws in Dr. Radwin's report, but two stand out as particularly significant. First, in deciding whether an identified task was properly considered a seaman's task or not, Dr. Radwin simply accepted a classification of work tasks supplied him by the plaintiffs' counsel. This classification treated "[h]ousekeeping duties," "[p]icking up trash," "[s]weeping and mopping," and "[c]leaning and sanitizing" as non-seaman duties. At the very least, this is an inaccurate overgeneralization. Various cases have recognized, to the contrary, that keeping a vessel and its decks clean and safe are traditional duties of seamen. See, e.g., Harkins, 385 F.3d at 1100, 1104 (workers who performed "housekeeping chores" on vessel covered by the "seaman" exemption); Louviere v. Standard Dredging Corp., 239 F.2d 164, 165 n.2 (5th Cir. 1956) ("scrubbing the deck" a duty "routinely performed by a crew member"); Selby v. Yacht Starship, Inc., 624 F. Supp. 2d 1367, 1378 (M.D. Fla. 2008) (finding that "general cleaning duties were necessary to the safe and efficient operation of the vessel and therefore qualify as seaman's duties"). This misclassification of tasks makes the raw data Dr. Radwin relied on unreliable.

Second, Dr. Radwin excluded from his calculations time during which BHC employees were not observed performing active tasks. This was a methodological and analytical error because it failed to take account of the fact, undisputed in this case, that both deckhands and galley attendants were expected, as a continuous part of their service, to be observant of conditions on the vessel and alert to the need to respond when and as necessary to events that might occur. An example would be the incident mentioned above in which McGrath alerted the captain to her observation of some children in a potentially dangerous position on the boat.

It has long been recognized that some work assignments necessarily include, because of their particular circumstances, periods of "inactive duty" that an employee is hired to perform. See Armour & Co. v. Wantock, 323 U.S. 126, 133 (1944). Common examples are fire fighters or security guards. Whether the employment requires such "stand-by" duties is a question of fact to be resolved on the pertinent facts, id., and the undisputed facts in this case show that both deckhands and galley attendants had those duties while the vessel was *en voyage*. That being so, it does not matter that during such periods of "inactive duty" the employees might read a book or socialize with other employees. Id. at 134. See also 29 C.F.R. § 785.15 ("On duty.").

Even if the galley attendants were performing "work of a different character" than seaman's work (see § 783.31) when they dispensed drinks or snacks (tasks characterized by Dr. Radwin as group 2, or non-seaman, work), Radwin's study did not find that the time spent in that non-seaman work exceeded 20% of the total time worked by the galley attendants. (See Pls. Opp'n, Ex. 4 at 9 (table 3) (dkt. no. 166-4).) Accordingly, such non-exempt work would not have been considered "substantial" within the meaning of the DOL regulations. See § 783.37.

The plaintiffs' reliance on the Radwin report is unavailing not only because the study was flawed in its conception and design, but also because the plaintiffs try to use it to support a false legal proposition. The plaintiffs take the 20% benchmark of the DOL regulation for determining when non-seaman's work may be considered "substantial" and flip it upside down to come up with a putative rule that would characterize an employee as a seaman only if the employee spent 80% of his or her time actively engaged in seaman's duties. They then cite Dr. Radwin's time study as evidence that the time BHC crew members spent actively performing seaman's duties fell short of the 80% benchmark because so much of their time was idle time, thus disqualifying them for the exemption.

The plaintiffs' argument is wrong. They have a bit of math on their side, but that is all. It is true, of course, that if an employee's work must be characterized as either seaman's or non-seaman's work, and if the non-seaman's work must comprise 20% or less of the time worked for the exemption still to apply, then in such a case as a mathematical matter seaman's work will obviously comprise 80% or more. What the plaintiffs have made up, however, contrary to settled law, is the idea that only active performance of tasks can count in assessing whether the employee is doing seaman's work 80% of the time. The plaintiffs, led by Dr. Radwin's thesis, effectively import a third category, non-work, and subtract that from the total time spent on duty to produce a number lower than 80%. In other words, they use a made-up category in applying a made-up rule. Their proposed approach is one that the DOL regulations do not address, much less endorse, and it is one that courts have regularly rejected. See McMahan v. Adept Process Servs., Inc., 786 F. Supp. 2d 1128, 1138 (E.D.Va. 2011). It also flies in the face of the settled principles about "inactive duty" discussed above. See Armour & Co., 323 U.S. at 133.   While questions about what duties employees actually performed are questions of fact, with factual disputes to be resolved by a jury, the question whether the exemption applies in the circumstances of particular settled facts is a question of law for the court. Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986); Hines v. Longwood Events, Inc., 2010 WL 2573194 at *7 (D. Mass., June 23, 2010). The pertinent facts established as undisputed or indisputable by the summary judgment record here show that the plaintiffs, both general deckhands and galley attendants, performed work (1) aboard a vessel, (2) subject to the control of the master of the vessel, (3) that is rendered primarily as an aid in the operation of the vessel as a means of transportation, and further, (4) that they did not perform substantial work of a different character.

Accordingly, the "seaman" exemption set forth in 29 U.S.C. § 213(b)(6) applies to the plaintiffs and defeats their claims to overtime pay. As noted above, nothing appearing to the contrary, it is likely that the Massachusetts courts would follow federal law with respect to this interpretation.

The defendants' motion for summary judgment is GRANTED. Judgment shall be entered in the defendants' favor on the plaintiffs' federal and state claims.

It is SO ORDERED

/s/ George A. O'Toole, Jr.  
United States District Judge